**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 31, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CURTIS A. ANTHONY,

      Defendant - Appellant,

--------------------

THE HUMAN TRAFFICKING
INSTITUTE,

      Amicus Curiae.

No. 18-6047

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:15-CR-00126-C-5)**
_____

Dean Sanderford, Assistant Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

K. McKenzie Anderson, Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.
_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

A jury convicted Curtis A. Anthony of child-sex trafficking and conspiracy to commit child-sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), (c) and 1594(c). The district court sentenced Anthony to the statutory mandatory-minimum 10 years' imprisonment and ordered that he pay restitution to the two child victims—R.W. and M.M—in the amount of $327,013.50 and $308,233.50, respectively. On appeal, Anthony contends that these amounts exceed actual losses resulting from his two offenses of conviction. He raises two issues with the restitution order: (i) that it impermissibly compensates harms that R.W. suffered from an earlier, unrelated sex-trafficking criminal enterprise run by a different wrongdoer; and (ii) that, for his conspiracy count, it compensates R.W.'s and M.M.'s harms beyond a smaller conspiracy proved at trial (a subset of the broad, charged conspiracy). We agree with Anthony on both issues, but we disagree that he has established plain error on the second issue. Thus, exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm the district court's restitution order as covering the broad, charged conspiracy, but we vacate the order and remand for a recalculation of losses to ensure that no restitution is awarded for harms that R.W. suffered during the earlier sex-trafficking offense.

## BACKGROUND

In May and June 2014, when R.W. was 14 years old, a pimp named William Johnson prostituted her in the Oklahoma City, Oklahoma area. William pleaded guilty in 2015 to a federal charge of sex trafficking a minor, was later sentenced to 30 years in prison, and was ordered to pay R.W. $900,000 in restitution. *See* Amended Judgment,

*United States v. Johnson*, No. CR 14-0341-F (W.D. Okla. Jan. 13, 2016), ECF No. 83. In a victim-impact statement prepared for that case, R.W. reported that William had taken her virginity, had "beat the mess out of" her, and had "brainwashed" her "into practically being a slave." ROA vol. 2 at 70. R.W. described the psychological effects of this abuse, including her not "know[ing] how to act around people [her] age" and feeling "no worth whatsoever." *Id.* at 71. R.W. also reported numerous symptoms of psychological trauma such as nightmares, fear for her safety, fear of being alone, fear of adults and strangers, anxiety, depression, anger, crying spells, and feelings of helplessness.

On October 8, 2014, after law-enforcement officers rescued R.W., and she had returned home, she received Facebook messages from another pimp, Maurice M. Johnson (no relation to William) and one of his adult prostitutes, Chelsee A. Griffin, offering to pick her up to "make money." *Id.* vol. 3 at 345. After midnight on October 9, Maurice picked up R.W., photographed her, and had a longtime associate, Tonya Gay Gum, post the photos on websites advertising escort services. For a share of the escort revenue, Gum operated a "call center" with over twenty publicly listed phone numbers—all of which forwarded to two personal cell phones—through which she fielded requests for sexual services and arranged for escorts to meet with customers. *Id.* at 38–39. After using these services to traffic R.W. for about two weeks, Maurice had her recruit her friend, 15-year-old M.M., to work as a prostitute. M.M. did so for about a week before law enforcement

3

halted the operation. In their time with Maurice, R.W. and M.M. together brought in about $40,000 from prostitution.

On the evening of October 24, 2014, Anthony called one of Gum's escort lines. Anthony stated only that he was "looking for company" at his office. *See id.* at 254–55. Gum sent R.W. to the office, but when she arrived, Anthony couldn't locate his wallet, so he and R.W. drove to an ATM to withdraw cash for the transaction. But Anthony was unable to make a withdrawal without his wallet, so R.W. left with Maurice, who had followed them to the ATM along with M.M., Griffin, and two others. Minutes later, while the group was heading back, Anthony called again and asked for R.W. to return because he had located his wallet and now had cash. Maurice turned around and drove R.W. back to Anthony's office, this time sending M.M. in with her. Anthony paid the girls to strip naked, touched their bodies, and stated that he wanted to finish "the date with M.M." *Id.* at 443. So R.W. gave M.M. a condom and waited outside while M.M. and Anthony had sex for money.

On October 27, 2014, law-enforcement officers, while running an undercover-sting operation, located and rescued R.W. and M.M. Maurice had kept the girls in a hotel room where he forced them into commercial sex transactions. He and Gum split the proceeds. Maurice used psychological manipulation, threats of force, and physical abuse to control the girls. As R.W. later testified, Maurice had treated her "[l]ike a slave,

4

basically." *Id.* at 446. Griffin also testified that Maurice was a violent and dangerous man.

On June 16, 2015, a federal grand jury sitting in the Western District of Oklahoma indicted Anthony on child-sex-trafficking charges. On January 6, 2016, the grand jury returned a superseding indictment charging Anthony with: (i) child-sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), (b)(2), and (c); and (ii) conspiracy to commit child-sex trafficking, in violation of 18 U.S.C. § 1594(c).[1] The superseding indictment named

---

[1] To violate § 1591, the defendant must have known or recklessly disregarded that the victims were minors, absent a "reasonable opportunity to observe" them. *See* 18 U.S.C. § 1591(a)(1) & (c). In the substantive trafficking count, the superseding indictment charges that Anthony had a reasonable opportunity to observe R.W. and M.M., thus obviating the need to establish his knowing or reckless disregard of their minority status. But we note that Anthony had no opportunity to observe the victims when he called the escort service and allegedly conspired to violate § 1591. Nor, for that matter, did Anthony request that Gum send a minor escort. As a result, under §§ 1591(a)(1), (b)(2), (c) and 1594(c), it appears that the government needed to prove that Anthony knew or recklessly disregarded that the victims were minors when he entered the conspiracy.

At trial, the government presented no evidence that Anthony either knew or recklessly disregarded the victims' minority status when he initially contacted Gum to arrange for an escort. During argument on a motion for acquittal, discussed *infra*, the district court noted the absence of such evidence and expressed skepticism that Anthony "had any involvement in a child sex trafficking conspiracy." *See* ROA vol. 3 at 540–41. In response, the government asserted that R.W. and M.M. were in fact coconspirators, that Anthony had a reasonable opportunity to observe them when they arrived at his office, and that he entered the conspiracy when he agreed to pay them for sexual services. *See id.* at 540 (arguing that "there's no restriction on who a co-conspirator is"). Under that theory, the government would not have to prove that Anthony knew or recklessly disregarded R.W. and M.M.'s minority status.

Anthony does not raise this issue on appeal, so we address it no further. But we note that, if R.W. and M.M. were indeed coconspirators—though the indictment contains no such allegation—the government offers no authority for awarding any restitution to them. It isn't clear that the restitution statutes would authorize such an award. *See, e.g.*, *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006) (holding that treating coconspirators as "victims" who are entitled to restitution from fellow

as coconspirators Anthony and two other adult customers—Trung N. Duong and William M. Baker, both of whom pleaded guilty—who had paid R.W. for sexual services. None of the three men knew each other. Gum—who had pleaded guilty to the original indictment—was named as an unindicted coconspirator. Maurice was prosecuted in a separate action. *See United States v. Johnson*, No. 14-CR-0342-C-1 (W.D. Okla. Aug. 6, 2019).

The superseding indictment alleged a conspiracy spanning the time that R.W. had spent with Maurice—from October 8 to 27, 2014. The conspiracy's charged objective was "to operate and perpetuate a prostitution enterprise that recruited, enticed, provided, obtained, and maintained minors."[2] ROA vol. 1 at 65. The enterprise allegedly benefited Maurice and Gum financially and benefited Duong, Baker, and Anthony by enabling them to complete commercial sex transactions.[3] With R.W.'s and M.M.'s prostitution earnings, Gum funded her escort business, and Maurice recruited and controlled his

---

perpetrators is a "fundamental" error that "adversely reflect[s] on the public reputation of judicial proceedings").

[2] As we read the record, the evidence showed that Maurice and Gum operated a general prostitution ring that happened to include two minor females, not that they operated an exclusively child-prostitution enterprise. At trial, the government offered evidence of only two children involved in the enterprise: R.W. and M.M. At the same time, it offered evidence suggesting that Maurice and Gum had arranged commercial sex transactions with numerous other prostitutes, including at least one adult prostitute: Griffin.

[3] Allegations concerning "benefits" to each member of the charged conspiracy appear to be remnants from the original indictment, which also charged a violation of 18 U.S.C. § 1591(a)(2).

prostitutes. The superseding indictment alleged as specific "acts in furtherance of the conspiracy" (i) Maurice's recruitment of R.W. (but not M.M.); (ii) Maurice's making R.W. available to Gum as a prostitute; and (iii) Gum's arranging the commercial sex transactions for Duong, Baker, and Anthony. *See id.* at 67–70.

In mid-June 2017, Anthony went to trial. Both R.W. and M.M. testified as government witnesses, as did Maurice, Gum, and Duong. Gum testified that, in October 2014, she fielded over 10,000 calls on her escort phone lines scheduling commercial sex appointments. She testified about sending R.W. on four calls during the alleged conspiracy: once to Baker, twice to Duong, and once to Anthony. Maurice, meanwhile, testified that he would meet Gum five to six times on a normal workday to give her proceeds from completed appointments.[4]

After the close of the government's case-in-chief, Anthony orally moved for a general judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The district court reserved decision until after the close of all the evidence, at which point it denied the motion for the substantive trafficking count. The next day, the court denied the motion for the conspiracy count. Anthony did not renew his Rule 29 motion at the end of trial.

On June 19, 2017, the jury returned a guilty verdict on both counts. On September 18, 2017, the government moved for restitution awards totaling $530,000 for R.W. and

---

[4] This testimony suggests that Maurice and Gum had arranged commercial sex transactions with far more customers than those involved in the charged conspiracy, but the government mentions no other customers that have been charged and held accountable for restitution to R.W. and M.M.

$510,000 for M.M., including $300,000 each for a lifetime of psychological treatment, $200,000 each for a lifetime of lost income, and $30,000 for R.W. and $10,000 for M.M. for Maurice and Gum's ill-gotten gains. The government requested that the district court hold the coconspirators jointly and severally liable for the full amounts. *See* 18 U.S.C. § 3664(h).

The government submitted victim-impact statements to support its request for restitution. For R.W., it submitted her statement from William's case and a statement about psychological trauma resulting from the instant conspiracy. In the latter statement, R.W. expressed that she "look[s] at <u>men</u> <u>very</u> different" and is "scared that all men are like this." ROA vol. 2 at 67. She further reported experiencing the same symptoms of psychological trauma that she had reported in William's case. For M.M., the government submitted a declaration from M.M.'s guardian ad litem attesting that M.M.'s encounter with Anthony "made her feel less than human, humiliated and ashamed." *Id.* at 108. She also attested that M.M. now experiences trouble concentrating and sleeping, nightmares, and feelings of shame, sadness, and anger.

On October 24, 2017, the district court sentenced Anthony to the statutory mandatory-minimum term of ten years' imprisonment, to be followed by five years' supervised release. At the hearing, the court stated that, though it was "not entering an order of restitution at this time," it intended to order "joint and several" restitution among

the coconspirators. *Id.* vol. 3A at 56. Anthony waived his right to attend any future restitution hearing.

On December 11, 2017, in a one-page response to the government's restitution motion, Anthony argued that his "role in the conspiracy to which he was convicted was that he called an 'escort' line which sent R.W. and M.M., minors, to his home [sic] for sexual services without him knowing or having reason to know that they were minors." *Id.* vol. 1 at 226. Anthony stressed that "[t]his was a one-time event." *Id.* Beyond that, Anthony simply adopted Duong's response and surreply. Duong's response first faulted the government for failing to disaggregate from the request for future therapy costs the psychological harm that William had caused R.W. long before the instant conspiracy had even begun. Addressing lost future income, Duong's response argued that the requested amount failed to account for R.W.'s and M.M.'s abilities to increase their earning potential by pursuing high-school or college degrees. And, finally, Duong's response argued that Maurice and Gum should be solely responsible to reimburse the victims for all money obtained by prostituting them. In his surreply, Duong argued that the court should apportion his restitution liability under 18 U.S.C. § 3664(h) to reflect his "small role" in the conspiracy. *Id.* vol. 2 at 210–11.

On February 21, 2018, the district court granted in part the government's motion for restitution. The court declined to order that Anthony pay restitution for lost future income, but it did require that he pay restitution for the estimated $40,000 that Maurice and Gum had earned from prostituting R.W. and M.M., and for the full cost of R.W.'s and M.M.'s anticipated future therapy expenses—totaling $327,013.50 and $308,233.50,

9

respectively. The court held Anthony, Gum, Duong, Baker, and Maurice jointly and severally liable for the full awards. This appeal followed.

ANALYSIS

Anthony raises two issues on appeal. First, he argues that the district court erred by ordering that he pay restitution for losses that R.W. had sustained while with William, months before the instant conspiracy. And second, he argues that the district court erred by ordering restitution for all the losses that R.W. and M.M. suffered during the charged three-week conspiracy, when at most he had joined a subset of that broad conspiracy by conspiring to obtain sexual services one time, on October 24, 2014. In short, Anthony argues that the district court erred by ordering restitution against him for losses beyond those he caused.

## I.        The Restitution Statutes

Courts may award restitution only as authorized by statute. *United States v. Gordon*, 480 F.3d 1205, 1210 (10th Cir. 2007). Here, the district court ordered that Anthony pay restitution to R.W. and M.M. under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, and the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1593. Anthony argues that neither statute authorizes the full restitution award against him, because the award compensates the victims for losses that he did not cause. We review de novo the district court's interpretation of the restitution statutes, review for clear error its factual findings, and review for abuse of discretion the restitution amount. *See United States v. Camick*, 796 F.3d 1206, 1223 (10th Cir. 2015); *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008). A district court abuses its

10

discretion if it orders a restitution amount based on an "erroneous view of the law or on a clearly erroneous assessment of the evidence." *United States v. Howard*, 784 F.3d 745, 750 (10th Cir. 2015) (citation omitted).

Restitution may be ordered only for losses actually resulting from the offense of conviction. *United States v. West*, 646 F.3d 745, 751 (10th Cir. 2011). So before ordering restitution, the district court must determine whether the victim's losses result from the offense of conviction. *See United States v. Zander*, 794 F.3d 1220, 1233 (10th Cir. 2015). The government bears the burden of proving the amount of loss by a preponderance of the evidence. *United States v. Galloway*, 509 F.3d 1246, 1253 (10th Cir. 2007). It "bears the same burden regarding the subordinate question of what harms are properly included in the loss calculation because they are 'a result of the offense.'" *United States v. Wells*, 873 F.3d 1241, 1265 (10th Cir. 2017) (quoting 18 U.S.C. § 3664(e)).

What standard of causation applies, though, is a matter of some dispute. Anthony insists that both the MVRA and TVPRA limit restitution to losses directly resulting from the offense of conviction. But the government argues that the two statutes require a

11

showing of only proximate causation.[5] Our cases have resolved this issue for the MVRA but not for the TVPRA.

The MVRA provides that, for certain crimes,[6] a court must order restitution for the "full amount" of the victim's losses. 18 U.S.C. § 3664(f)(1)(A). The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense." *Id.* § 3663A(a)(2). We have construed this language to require "both that the defendant's conduct is the 'but-for' cause of the individual's harm and that the defendant 'proximately' caused the harm." *United States v. Speakman*, 594 F.3d 1165, 1171 (10th Cir. 2010); *see also Wells*, 873 F.3d at 1266 (applying *Speakman*'s "direct-and-proximate

---

[5] In his opening brief, Anthony argues only that the statutes limit restitution "to losses proximately caused by the offense of conviction." Appellant's Opening Br. 12. But Anthony's argument implicitly relies on but-for causation—he argues that the district court improperly ordered restitution for losses that he did not directly cause. In its response, the government argues that the statutes "require proximate causation, not but-for causation." Appellee's Br. 34. Anthony then proclaims in his reply that the parties' "primary dispute" is "whether the statutes incorporate the traditional but-for causation standard," Appellant's Reply Br. 4, even though his opening brief doesn't mention that standard.

[6] The district court ordered restitution under the MVRA, and the parties tacitly agree on the statute's applicability. But neither section under which Anthony was convicted—18 U.S.C. §§ 1591(a)(1) and 1594(c)—falls within the categories of crimes for which the MVRA mandates restitution. *See* 18 U.S.C. § 3663A(c)(1)(A). The Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, though, authorizes restitution for convictions under Title 18 of the U.S. Code. *Id.* § 3663(a)(1). The VWPA uses the same causation standard as the MVRA, and both statutes rely on the procedures in 18 U.S.C. § 3664. *See id.* § 3663(a)(2) & (d). The VWPA thus supplies the authority for restitution that the district court mistakenly derived from the MVRA.

standard"). So Anthony is correct that the statute limits restitution to losses directly resulting from his offenses of conviction.

But our cases have not addressed the causation standard for restitution under the TVPRA. The TVPRA mandates restitution for "any offense under" Chapter 77 of the U.S. Code, which includes slavery and human-trafficking offenses. 18 U.S.C. § 1593(a). Restitution must cover the "full amount of the victim's losses," *id.* § 1593(b)(1), which the statute defines by reference to the Mandatory Restitution for Sexual Exploitation of Children Act (MRSECA), 18 U.S.C. § 2259, *see id.* § 1593(b)(3). That statute—which mandates restitution for sexual and other child-abuse offenses described in Chapter 110 of the U.S. Code—defines the "full amount of the victim's losses" as "costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses." *Id.* § 2259(c)(2). The Supreme Court has construed this language to impose a proximate-cause limitation but not a "strict but-for causation" test. *Paroline v. United States*, 572 U.S. 434, 458 (2014).

*Paroline* involved a conviction for child-pornography possession under 18 U.S.C. § 2252, a Chapter 110 offense triggering MRSECA restitution. The Court grappled with the "atypical causal process" for losses in that context, where a defendant is just "one of thousands who have possessed and will in the future possess the victim's images but who has no other connection to the victim." *Id.* at 449. The Court worried that a but-for test would effectively foreclose restitution from any possessor, because it is "not possible" for a victim to "prove that her losses would be less . . . but for one possessor's individual role in the large, loosely connected network through which her images circulate." *Id.* at 450.

13

The Court concluded that this "special context" warrants departing from a but-for test for restitution under § 2259. *Id.* at 458. Instead of applying a strict but-for test, the Court concluded that restitution in such cases should "comport[] with the defendant's relative role in the causal process that underlies the victim's general losses." *Id.*

Relying on *Paroline*, the government insists that TVPRA restitution does not require but-for causation. But *Paroline* specifically concerned the application of § 2259 to convictions under § 2252 for child-pornography possession, and it "explicitly limited" its holding to that "special context." *United States v. Kolodesh*, 787 F.3d 224, 242 (3d Cir. 2015) (quoting *Paroline*, 572 U.S. at 458). *Paroline* did not even decide the causation standard for all Chapter 110 offenses to which § 2259 applies. Indeed, many Chapter 110 offenses do not involve the "atypical causal process" driving *Paroline*'s reasoning, *i.e.*, where the offender's connection to the victim is attenuated. *See, e.g.*, 18 U.S.C. § 2251A (barring the selling and purchasing of children). If *Paroline* did not abrogate but-for causation for those offenses, it follows that it did not abrogate but-for causation for restitution under the TVPRA—a statute governing Chapter 77 offenses that borrows § 2259's causation language.

That does not mean, though, that § 2259 *requires* but-for causation for TVPRA offenses. Section 2259 limits restitution to losses that the victim suffered "as a proximate result of the offense[]." Given its ordinary meaning, language describing the "result" of something "imposes . . . a requirement of actual causality." *Burrage v. United States*, 571 U.S. 204, 211 (2014). And actual causality requires proof of but-for causation, absent a "textual or contextual indication to the contrary." *Id.* at 212. Indeed, "it is one of the

14

traditional background principles 'against which Congress legislate[s]' that a phrase such as 'results from' imposes a requirement of but-for causation." *Id.* at 214 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013)); *see also Paroline*, 572 U.S. at 450 (recognizing this "legal tradition"). We therefore must determine whether a textual or contextual reason counsels against imposing such a requirement here.

We see none. That the statute's text mentions only proximate causation does not mean it abrogates but-for causation. Even *Paroline* did not adopt such an interpretation; it found only that § 2259's text "by no means *requires* but-for causation by its terms." 572 U.S. at 458 (emphasis added). In addition, but-for causation is well suited to the TVPRA context—at least for child-sex-trafficking offenses (like Anthony's) under §§ 1591(a)(1) and 1594(c). Unlike the "special context" of child-pornography possession, where a court cannot attribute a discrete amount of the victim's losses to a single possessor in a "large, loosely connected network," *see Paroline*, 572 U.S. at 450, it *is* possible to attribute an amount of a sex-trafficked child victim's losses to the child's trafficker. Traffickers buy or sell minors for sexual services; they are far from faceless perpetrators remotely connected to the victims. Unlike possessors of child pornography, who passively consume materials depicting *past* abuse, traffickers actively abuse their victims—whether by sexually assaulting them or by prostituting them to others in exchange for money. In these circumstances, it is easier to show that at least some of the victim's losses would not have occurred but for the trafficker's conduct.

Determining whether the TVPRA requires a showing of but-for causation is more than an academic exercise. The TVPRA authorizes restitution "[n]otwithstanding" the

MVRA. 18 U.S.C. § 1593(a). Thus, if the TVPRA requires only proximate causation, restitution for losses that the defendant did not directly cause might be permissible under the TVPRA but not under the MVRA. In the circumstances of this case, though, we conclude that both statutes limit restitution to losses that the defendant's conduct has directly and proximately caused.

But-for and proximate causation are well-established concepts in the law. *Wells*, 873 F.3d at 1266. The but-for cause of an event is that "without which the event could not have occurred," while the proximate cause is that which is "legally sufficient to result in liability." *United States v. Burkholder*, 816 F.3d 607, 613 (10th Cir. 2016) (citations omitted). The "basic question" for proximate causation "is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue." *Robers v. United States*, 572 U.S. 639, 645 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). And this question "entails an inquiry into the foreseeability of the harm." *Wells*, 873 F.3d at 1267. Where other causes have contributed to the harm, the inquiry focuses on "whether the defendant bears the risk of all the harm" or "whether the chain of causation was in effect broken by the intervening cause, resulting in less harm for which the defendant would be held liable in restitution." *Id.* (citation omitted). An

intervening cause that is "directly related to the defendant's offense" does not break the chain. *Speakman*, 594 F.3d at 1172.

With these principles in mind, we address Anthony's substantive challenges to the district court's restitution order.

## II.     Liability for Past Harm

Anthony argues that the district court's restitution order fails to disaggregate, and thus compensates, harms that R.W. sustained during her earlier, months-long exploitation by William Johnson. Anthony posits that "[t]he losses that William inflicted on R.W. were clearly not caused by the offenses in this case" because William's crimes were "distinct crimes, separate in time and in participants." Appellant's Opening Br. 14–15. In short, Anthony argues that his conduct was not the but-for cause of all the harm that the restitution order compensates. We agree.

Months before the events in this case, William trafficked R.W. in Oklahoma City. R.W.'s victim-impact statement in William's case described his abusive behavior and its long-term psychological damage to her. R.W. resubmitted that statement for consideration in this case, which we understand to mean that she still suffers the harms William's exploitation caused her. Separately, in a victim-impact statement written for this case, R.W. reported experiencing the same symptoms of psychological trauma that

17

she had reported in William's case. It therefore appears that many of R.W.'s harms predate Anthony's involvement and would exist regardless of his crimes.

The government, though, did not even try to disaggregate William's harms in its request for restitution. Instead, it submitted both victim-impact statements[7] and relied on harms from each as indicia of R.W.'s "psychological trauma . . . from being trafficked." ROA vol. 2 at 47. It then requested almost $300,000 for a lifetime of psychological care to address these undifferentiated harms. To support this figure, it relied on calculations from its expert witness—certified physician's assistant Julie Bryant—which accounted for William's abuse. Rather than limit her analysis to the harms that R.W. sustained during the three weeks at issue in this case, Bryant considered R.W.'s general "trauma . . . [as] a victim of sex trafficking when she was 14 years old," *id.* at 81, as well as her "emotional damage" from "the last few years while being involved in the human trafficking ring," *id.* at 84. In short, Bryant did not differentiate the psychological treatment needed to address the harms William caused versus the harms caused by the conduct charged in this case.

From this, the district court ordered restitution, including about $300,000 for R.W.'s future psychological care. Consistent with the government's approach, the court did not differentiate the harms in this case from the harms that William had caused. Instead, the court found the harms described in R.W.'s "Victim Impact *Statements* . . .

---

[7] The government acknowledged that "some of the questions and answers" in the statements "relate to a separate case," ROA vol. 2 at 47, but didn't identify *which* harms related to William's case. It simply listed harms from both statements.

appropriate matters for consideration in determining the amount of restitution." *Id.* at 215 (emphasis added). It also accepted Bryant's "valuation of the necessary psychological care for R.W." as "well supported" by a preponderance of the evidence. *Id.* at 218. But the court did not identify what evidence of harm in *this case* supported the valuation. In fact, its only reference to harm in this case was to mention generally that R.W. "suffered harm as a result of the criminal activity in this case." *Id.* at 215. This finding—unspecific to any defendant—does not establish that Anthony caused *all* the harm that the restitution order compensates.

Tellingly, the district court recognized the "overlap" between the harms in this case and the harms that William had caused, but it declined to disaggregate those harms because "relevant law requires the Court to make the victims whole in this case." *Id.* The law indeed seeks to make victims whole for their losses. *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015). But it intends to make them whole for losses that they incur only from the offense of conviction. A restitution amount that exceeds such losses and compensates other harms constitutes an "illegal sentence." *United States v. Griffith*, 584 F.3d 1004, 1019 (10th Cir. 2009) (citation omitted). Simply put, the obligation to make victims whole does not obviate the need to limit restitution to losses resulting from the defendant's convicted conduct.

Nevertheless, the district court declined to limit the restitution amount absent evidence from Anthony that R.W.'s previous award for $900,000 in William's case had "changed or altered the harm suffered in this case." ROA vol. 2 at 215. In other words, the court faulted Anthony for not proving an entitlement to an offset. *Cf. United States v.*

19

*Serawop*, 505 F.3d 1112, 1127 (10th Cir. 2007) (requiring the defendant who killed a three-month old girl to show any offsets to the total restitution losses he alone caused).[8] But this presupposes a proper restitution amount to offset. The problem is that the ordered-restitution amount unlawfully compensates harms that Anthony did not cause. The *government* had the burden to prove what losses Anthony caused. *See* 18 U.S.C. § 3664(e). Only then would Anthony be responsible to claim any offset. Otherwise stated, it was not Anthony's burden to disentangle from the restitution amount past compensation for losses that William—and not Anthony—caused. William's harms to R.W. should never have been part of Anthony's baseline total restitution.[9]

On appeal, the government does not dispute that the restitution order accounts for losses that William caused R.W. Instead, it defends the order on grounds that, regardless of R.W.'s previous abuse, "Anthony's offenses independently caused the losses for which she was awarded restitution." Appellee's Br. 29. It then recounts R.W.'s experiences with Maurice, insisting that the harms from those experiences justify the "full restitution"

---

[8] After faulting Anthony for not proving an entitlement to an offset based on the restitution award in William's case, the district court stated that such an offset would violate 18 U.S.C. § 3664(f)(1)(B). The court thus placed Anthony in a double bind, requiring him to prove an offset but stating that an offset would be unlawful. In any case, § 3664(f)(1)(B) is inapposite. That provision forbids reducing a restitution award to account for compensation that a victim has received from "any other source," 18 U.S.C. § 3664(f)(1)(B), but Anthony doesn't contend that restitution should be discounted for any third-party compensation.

[9] It is worth noting that Anthony did not request an offset at the district court. He argued—as he does on appeal—that the restitution award exceeds the losses that he actually caused, not that it fails to account for R.W.'s compensation in William's case.

award. *Id.* at 37. But when it originally moved for restitution, the government relied on harms identified in R.W.'s victim-impact statement from William's case and on a valuation for future therapy that accounted for losses that William had inflicted. And the district court, by simply adopting the government's valuation, factored in William's abuse when it ordered restitution. On remand, the government must prove that Anthony's acts justify the requested restitution award.[10] Right now the award is based on calculations that are not limited to those acts. The government cannot now claim that the award would have been the same had William's abuse not already occurred when it made no attempt to isolate the harm from Anthony's offenses in its original loss calculation.

But the government disclaims any need to isolate Anthony's share of the harm vis-à-vis William, arguing simply that Anthony need not have been "the sole cause of harm" for "entire liability" to attach. *See id.* at 32–33 (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)). The government relies on *In re Sealed Case*, a child-sex-trafficking case involving victims who had suffered psychological harms even before associating with the defendant. As here, the defendant argued that he should not have to pay for a lifetime of treatment, because he did not cause all the victims' harm. The D.C. Circuit

---

[10] We recognize that the restitution award seeks to compensate not only harms resulting from R.W.'s encounter with Anthony but also all the harms that she endured during the broad, charged conspiracy. We address, *infra*, Anthony's responsibility for the losses resulting from that conspiracy. But on the substantive trafficking count, the government's evidence at trial was that Anthony paid R.W. and M.M. to strip naked, then had sex with M.M. while R.W. waited outside. M.M. thus sustained the bulk of Anthony's harmful conduct. Anthony's conduct toward R.W. was reprehensible, but the government still must prove how that conduct warrants compensation for a lifetime of psychological treatment.

rejected this argument, citing expert testimony that the defendant had been the "most significant cause" of the victims' harm and that they would have needed identical treatment even if they had had "no previous trauma." *In re Sealed Case*, 702 F.3d at 67. The court stressed that "entire liability for harm may be imposed . . . if two or more causes produce [a] single result and either one cause would be sufficient alone to produce [the] result or each cause is essential to [the] harm." *Id.* at 66 (relying on *United States v. Monzel*, 641 F.3d 528, 538 (D.C. Cir. 2011)). Similarly here, the government argues, Anthony's crimes were sufficient for R.W.'s trauma.

This out-of-circuit authority is triply inapposite. First, unlike the expert in *In re Sealed Case*, physician's assistant Bryant did not conclude that R.W. would have needed identical treatment even if William had not already harmed her. Thus, on this record, it is not clear that Anthony's harms were sufficient, apart from William's harms, to require a lifetime of psychological treatment. Second, as explained above, the restitution statutes require that the defendant's offenses were the but-for cause of the victim's losses. *In re Sealed Case*'s sufficient-causation test—a "rare" alternative to a "strict but-for" causation test, *see Burrage*, 571 U.S. at 214—is inconsistent with that requirement. And third, in any event, a sufficient-causation test would not apply on this case's facts. As the Supreme Court explained in *Burrage*, the test ordinarily applies when "multiple sufficient causes independently, but concurrently, produce a result." *Id.* at 214. Even had the government offered evidence that Anthony's convicted conduct caused all of R.W.'s harms—and it

did not—the sufficient-causation approach would fail, because his crimes postdated, rather than concurred with, William's offenses.

We recognize the difficulty in setting a restitution amount in cases like this one, where the victim's asserted losses overlap with similar harms that occurred before the events at issue. But a district court cannot "simply 'rubber stamp' a victim's claim of loss" because it is difficult to distinguish past and present harms. *See Ferdman*, 779 F.3d at 1133. The court need not calculate the harms with "'exact' precision," but it must set a restitution amount that is "*rooted in a calculation of actual loss*." *Id.* (emphasis in original) (citations omitted). By ignoring this imperative and ordering restitution for losses that Anthony did not cause, the district court abused its discretion. *See United States v. Parker*, 553 F.3d 1309, 1324 (10th Cir. 2009); *United States v. Quarrell*, 310 F.3d 664, 678 (10th Cir. 2002). As a result, we will vacate the restitution order and remand for a recalculation limited to actual losses resulting from Anthony's offenses of conviction.

## III.  Liability for the Charged Conspiracy

Anthony's second objection is that the restitution award improperly holds him accountable for all the losses that R.W. and M.M. sustained from the roughly three weeks and one week in October 2014, respectively, during which Maurice held them captive. The superseding indictment charged Anthony with conspiring with Maurice, Tonya Gum, and two other customers to operate a child-prostitution enterprise for those three weeks, and the jury convicted him of that charge. Anthony now claims a variance between the broad, charged conspiracy and the proof offered at trial. He argues that, though the

23

evidence demonstrated Maurice's and Gum's participation in the broad, charged conspiracy, it proved only his involvement in a subset of that conspiracy, *i.e.*, a "much smaller conspiracy" with Gum to obtain R.W. and M.M. for a single sexual transaction.[11] *See* Appellant's Opening Br. 18. He argues that restitution should have been limited to losses resulting from that proved subset of the broad conspiracy.

Ordinarily, we consider the existence of a conspiracy variance in the context of an appeal from a conviction for the conspiracy charged in the indictment. *See, e.g.*, *United States v. Marquez*, 898 F.3d 1036, 1043 (10th Cir. 2018); *United States v. Fishman*, 645 F.3d 1175, 1189 (10th Cir. 2011). In that context, we inquire (i) whether the evidence at trial suffices to sustain the jury's finding that the defendant was a member of the single charged conspiracy; and (ii) if the evidence proves multiple conspiracies, whether the variance substantially prejudiced the defendant's rights. *See United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008). Prejudice exists if the defendant lacked sufficient notice of the need to defend against smaller conspiracies, or if the jury imputed to the

---

[11] Anthony characterizes the purported smaller conspiracy as an agreement to "obtain R.W. and M.M. for sex" on one night. *See* Appellant's Opening Br. 23. This characterization stretches the evidence offered at trial. The evidence established that Anthony called one of Gum's escort lines asking for company at his office, and that Gum put R.W. in touch with him. That R.W.—a minor prostitute—happened to fulfill Anthony's request does not prove that he conspired to obtain her for sex. Even less evidence supported a conspiracy involving M.M., who showed up with R.W. when she returned to the office after Anthony had located his wallet. Nevertheless, because Anthony concedes guilt of a conspiracy to obtain R.W. and M.M. for a sexual transaction, we will assume the existence of such a conspiracy.

defendant evidence of guilt offered against coconspirators who were involved in other conspiracies. *United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015).

Here, though he argues that the evidence at trial failed to prove his involvement in the broad, charged conspiracy, Anthony admits that evidence of his guilt in the smaller conspiracy sufficed for the jury to convict him of the charged conspiracy. *See* Appellant's Opening Br. 24 (explaining that a conviction "did not require a finding that he joined the larger, charged conspiracy"). "[W]e look to the elements of the crime as defined by law" to ascertain what facts the jury had to find to convict. *United States v. Caldwell*, 589 F.3d 1323, 1333 (10th Cir. 2009) (citation omitted). To convict Anthony of conspiracy to commit child-sex trafficking, the jury had to find (i) that "two or more persons agreed to violate" the child-sex-trafficking laws; (ii) that Anthony "knew at least the essential objectives of the conspiracy"; (iii) that he "knowingly and voluntarily became part of it"; and (iv) that the "alleged coconspirators were interdependent." *United States v. Serrato*, 742 F.3d 461, 467 (10th Cir. 2014) (quoting *Carnagie*, 533 F.3d at 1238).

In this case, the district court did not instruct the jury that it could convict only if Anthony had conspired with all the alleged coconspirators to operate a child-prostitution enterprise for three weeks. Rather, it instructed the jury on the *minimum* facts necessary to convict, *i.e.*, that "at least two individuals reached an agreement" at any time "between . . . October 8 . . . [and] 27, 2014," to "engage in sex trafficking of a child." *See* ROA vol. 3 at 563. Consistent with these instructions, the jury could convict on evidence proving only the supposed smaller conspiracy, *i.e.*, that Anthony had agreed with Gum to arrange a single sexual transaction with R.W. and M.M. No prejudicial guilt-spillover effect was

25

necessary to find Anthony guilty on this conspiracy. In its closing argument on the conspiracy count, the government focused solely on Anthony's single transaction with Gum and not on any facts that might tie him to the broad, charged conspiracy. For example, it did not argue that Anthony had conspired with the other indicted customers. And for good reason—despite charging them as coconspirators, the government introduced no evidence that the customers even knew of each other.

Nevertheless, despite conceding the evidence's sufficiency for his conviction, Anthony disputes its sufficiency for the restitution award. He contends that proof of the minimum facts necessary to convict on the broad, charged conspiracy isn't sufficient to justify restitution for the entire conspiracy. Rather, he argues, the scope of his restitution liability should approximate the scope of the conspiracy proved at trial.

But Anthony failed to preserve this argument in the district court. Before his sentencing, the government moved for "full restitution" for all losses resulting from the three-week conspiracy charged in the indictment. ROA vol. 2 at 53. The government requested that the court hold the alleged conspirators jointly and severally liable for the award, and at the sentencing hearing, the court indicated that it would grant that request. Rather than file his own briefing, Anthony joined his codefendant Trung N. Duong's response and surreply to the motion. Neither brief mentions Anthony's trial, much less suggests a variance between the indictment and the proof offered at trial. In fact, Duong's sole argument about "the conspiracy charged in this case," *id.* at 209, is that the district court should apportion restitution liability under 18 U.S.C. § 3664(h) to reflect his "small role" in it, *id.* at 210–11. Anthony reiterated this argument in his filing joining Duong's

26

briefs, asserting that, like Duong, his "role in the conspiracy to which he was convicted" was as a "one-time" customer. *Id.* vol. 1 at 226. Thus, Anthony contested only his share of restitution liability for the charged three-week conspiracy; he did not dispute that he had joined that conspiracy, nor did he argue that restitution should be limited to some smaller conspiracy proved at trial.[12]

Anthony insists that he preserved this restitution, conspiracy-variance argument by moving at trial for a general judgment of acquittal under Rule 29. In his view, a general motion for acquittal preserves "any and all challenges to the sufficiency of the evidence," including the evidence for restitution. Appellant's Reply Br. 12. A general motion for acquittal, however, constitutes a challenge to "the sufficiency of each essential element of the government's case." *United States v. Kelly*, 535 F.3d 1229, 1234–35 (10th Cir. 2008). And restitution is not an "essential element" of the government's case; it is a remedy that a district court imposes *after* the government proves its case and achieves a conviction. A sufficiency-of-the-evidence challenge under Rule 29, then, does not preserve a challenge to the evidence supporting restitution.[13] Instead, a defendant must specifically object to

---

[12] Anthony now argues that he "never has" sought apportionment of restitution liability. Appellant's Reply Br. 15. Indeed, he "basically concede[s]" the district court's authority to impose joint-and-several liability. *Id.* at 14. At the district court, though, Anthony adopted Duong's arguments "in their entirety," ROA vol. 1 at 226, and Duong expressly argued that the court should apportion restitution liability rather than order joint-and-several liability.

[13] Anthony indeed preserved a challenge to his conviction as based on insufficient evidence. Anthony moved for a general judgment of acquittal at the close of the government's case-in-chief. The district court reserved decision, then denied the motion after Anthony rested. Anthony did not then renew his motion, but renewal wasn't required in such circumstances to preserve an attack on the sufficiency of the

27

the evidence for restitution to preserve the issue for appeal. *See, e.g.*, *United States v. Wright*, 848 F.3d 1274, 1284 (10th Cir. 2017); *United States v. Zhou*, 717 F.3d 1139, 1154 (10th Cir. 2013); *United States v. Overholt*, 307 F.3d 1231, 1253 (10th Cir. 2002).

Because Anthony forfeited his conspiracy-variance argument, we review it for plain error. *See United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011). We will reverse only if (i) there is an error; (ii) that is plain, *i.e.*, "clear or obvious under current law"; (iii) "that affects substantial rights"; and (iv) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (citation omitted).

Anthony argues that the district court erred by compensating losses beyond his proved conduct underlying his conspiracy conviction. We have long held that a defendant convicted of a conspiracy offense is liable in restitution for all losses that proximately result from the conspiracy itself, including losses attributable to coconspirators. *See, e.g.*, *United States v. Osborne*, 332 F.3d 1307, 1314 (10th Cir. 2003); *United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir. 1999); *United States v. Brewer*, 983 F.2d 181, 184–85 (10th Cir. 1993). And we have equated the conspiracy of conviction for restitution purposes with the "offense as outlined in the indictment." *United States v. Alisuretove*, 788 F.3d 1247, 1258 (10th Cir. 2015). In those cases, though, the evidence offered at trial

---

evidence for his conviction. *See United States v. Wahl*, 290 F.3d 370, 373–75 (D.C. Cir. 2002) (holding that a defendant doesn't forfeit a sufficiency challenge by failing to renew a Rule 29 motion made after the close of the government's case-in-chief where the district court reserved decision until after submitting the case to the jury). But, as explained above, a preserved challenge to the evidence for a conviction doesn't preserve a challenge to the evidence for restitution.

proved the defendant's membership in the broad, charged conspiracy—not a subset of it with a non-fatal variance.

So this leaves Anthony room to argue that the conspiracy proved at trial, not the broader conspiracy charged, determines the scope of his restitution liability. In effect, Anthony suggests that, for restitution purposes, the conspiracy of conviction must conform to the proof at trial rather than the scope of the indictment.

The threshold matter, of course, is *whether* the conspiracy proved at Anthony's trial varied from the conspiracy charged in the superseding indictment. *See United States v. Windrix*, 405 F.3d 1146, 1153 (10th Cir. 2005). At a minimum, the evidence proved that for three weeks in October 2014, Maurice and Gum conspired to operate a prostitution enterprise, which included two prostituted minor females. Maurice and Gum played interdependent roles to ensure the success of the enterprise: Maurice recruited and controlled the girls, while Gum advertised the girls' services and connected them with customers. The government offered no evidence, however, that Anthony ever joined this broad conspiracy. Instead, it proved that Anthony and Gum agreed to arrange a single commercial sex transaction with R.W. on October 24, 2014.

The main deficiency in proof concerns the second and third conspiracy elements, *i.e.*, knowledge of the conspiracy's objective and knowing participation in it. *See United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (noting the "overlap[]" between these elements). To demonstrate knowing participation, the evidence must "show that the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009) (citation omitted). Though the

29

defendant need not know "the existence or identity" of all conspirators or "the full extent of the conspiracy," he must have a "general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator." *United States v. Evans*, 970 F.2d 663, 669–70 (10th Cir. 1992) (citation omitted). The knowing requirement is subjective, so we "examine the conspiracy from th[e] defendant's point of view." *Id.* at 674.

Here, nothing suggests that Anthony shared his alleged coconspirators' purpose to operate a child-prostitution enterprise throughout October 2014. From his perspective, Anthony sought to obtain R.W. and M.M. from Gum to have sex with on a single night. In fact, in its closing argument, the *government* described the "purpose of the agreement" from Anthony's perspective as "having sex," not as running a prostitution enterprise. *See* ROA vol. 3 at 573. The government now argues that Anthony knowingly provided money for the enterprise's "continued operation" and for the "provision of R.W. and M.M. to others." Appellee's Br. 49. Yet nothing suggests that Anthony considered or was motivated by the enterprise's viability or others' ability to obtain escorts from it. True, he likely knew that paying for sex with the victims facilitated a broader enterprise. And action that "facilitate[s] the venture as a whole" tends to prove the *interdependence* element of a conspiracy. *United States v. Acosta–Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011). But "[m]ere knowledge" that his actions furthered an illegal enterprise, even in conjunction with his participation in a small part of the enterprise, doesn't by itself establish that Anthony "joined in the grand conspiracy." *See United States v. Ellis*, 868 F.3d 1155, 1176 (10th Cir. 2017) (citation omitted); *cf. Evans*, 970 F.2d at 670 (noting that it would "pervert the concept of conspiracy" to treat a drug dealer as a member of a

30

"vast conspiracy" with the Medellin drug cartel simply because the dealer knows his supply is traceable to the cartel).[14]

We therefore conclude that a variance occurred between the indictment and the proof at trial. As explained above, the evidence for the smaller conspiracy was sufficient to convict Anthony of the charged offense. But that doesn't end the matter. In our view, where a variance occurs, and evidence for a smaller conspiracy proved at trial satisfies only the minimum facts necessary for the elements of the charged conspiracy offense, the smaller conspiracy constitutes the conspiracy of conviction for restitution purposes. To base restitution liability on a defendant's having been a coconspirator in the broad, charged conspiracy, when the evidence offered at trial shows otherwise, would contravene the "bedrock principle that restitution should reflect the consequences of the defendant's own conduct." *Paroline*, 572 U.S. at 455.

The government emphasizes that the evidence at trial proved the existence of the "full conspiracy." Appellee's Br. 50. We agree, but the evidence failed to prove that Anthony was a coconspirator in it. The government adds that the district court properly "impose[d] joint liability on *all* defendants for loss caused by others participating in the scheme." *Id.* at 45 (quoting *United States v. Moeser*, 758 F.3d 793, 797 (7th Cir. 2014)). Again, we agree on the permissibility of joint-restitution liability, but the "scheme" for

---

[14] The government insinuates that Anthony conceded joining the broader conspiracy when at trial his counsel admitted "some voluntariness there to do this agreement." Appellee's Br. 49 (emphasis omitted) (quoting ROA vol. 3 at 598). But the "agreement" to which counsel referred was Anthony's agreement with Gum to obtain a prostitute. Counsel never admitted that Anthony had joined a broader agreement to traffic children for profit.

which such liability can be ordered is the one proved at trial. The government, however, contends that the district court properly held Anthony liable for the charged conspiracy because it couldn't "substitute its view of the evidence . . . for the jury's verdict." *Id.* at 50 (quoting *United States v. Morgan*, 635 F. App'x 423, 443 (10th Cir. 2015)). But the verdict did not include a finding that Anthony had joined the broad, charged conspiracy; it simply found him guilty of the conspiracy offense, based on proof satisfying only the minimum facts necessary for the offense. Regardless, conforming restitution liability to the proof does not disturb the jury's verdict.

Because the district court erred by ordering restitution for the broad conspiracy, we must next determine whether the error is plain. Plain error exists if it is "'clear or obvious' under 'current, well-settled law.'" *United States v. Story*, 635 F.3d 1241, 1248 (10th Cir. 2011) (quoting *United States v. Whitney*, 229 F.3d 1296, 1308–09 (10th Cir. 2000)). In general, this means that "either the Supreme Court or this court must have addressed the issue." *United States v. Ruiz–Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003).

Here, Anthony falters. He cites no Supreme Court or Tenth Circuit authority ruling as we have today—that restitution liability for a conspiracy with a non-fatal variance is measured by the scope of the smaller conspiracy proved at trial rather than the conspiracy charged in the indictment. It is a matter of first impression for us whether a defendant's conviction for a smaller conspiracy limits his restitution liability. Thus, the district court's error in using the broad, charged conspiracy to measure restitution in this case is not plain

under "well-settled law." *See Story*, 635 F.3d at 1248. And that leaves Anthony unable to meet the plain-error standard.

## CONCLUSION

We vacate the district court's restitution order and remand for a recalculation of restitution based on actual losses resulting from Anthony's offenses of conviction.