RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0092p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSHUA D. ALDRIDGE,

*Defendant-Appellant*.

No. 23-3179

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cr-00095-9—Sarah Daggett Morrison, District Judge.

Decided and Filed:  April 17, 2024

Before:  MOORE, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  Steven D. Jaeger, HEMMER WESSELS MCMURTRY, Fort Mitchell, Kentucky, for Appellant.  Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

KAREN NELSON MOORE, Circuit Judge.  At the conclusion of a jury trial, Joshua Aldridge was found guilty of conspiracy to sex traffic an adult by force, threats of force, fraud, or coercion, among other charges.  Thereafter, the district court sentenced him to 324 months' imprisonment.  On appeal, Aldridge challenges the district court's denial of his Rule 29 motion and the district court's application of two sentencing enhancements.  For the reasons explained below, we **AFFIRM** the district court.

# I.  BACKGROUND

In 2009, Aldridge lived in rural southeast Ohio with his girlfriend Kathy,[1] Kathy's two young daughters, and Aldridge's parents.  R. 665 (Trial Tr. at 501–02, 505–06) (Kathy) (Page ID #5136–37, 5140–41).  Aldridge and Kathy were introduced to Larry Dean Porter, Kathy began to buy marijuana from Porter, and Aldridge purchased painkillers.  *Id.* at 510–11, 515–17 (Kathy) (Page ID #5145–46, 5150–52).  Although Aldridge had cautioned Kathy not to use painkillers, Kathy eventually began taking Lortab and Vicodin.  *Id.* at 516–17 (Kathy) (Page ID #5151–52).  Soon Kathy and Aldridge were both addicted to painkillers, and they sought out higher-dosage pills—specifically Oxycodone 30-milligram pills—from Porter.  *Id.* at 519–20 (Kathy) (Page ID #5154–55).  Initially, they were taking only one pill per day at a cost of about $30 or $40 per pill.  *Id.* at 521, 524 (Kathy) (Page ID #5156, 5159).  Over time, as their addiction worsened, Kathy needed three to four pills per day to maintain her high, and Aldridge needed four or five pills per day.  *Id.* at 522–23 (Kathy) (Page ID #5157–58).  If Aldridge and Kathy were unable to take a certain dose of Oxycodone on a given day, they would become "dope sick," which caused body and stomach aches and "felt like . . . dying."  *Id.* at 527–28 (Kathy) (Page ID #5162–63).

For a while, Aldridge and Kathy were able to pay for the pills with money from Aldridge's job, but, as their needs increased, it became difficult to fund their addiction.  *Id.* at 529 (Kathy) (Page ID #5164).  When they could not afford to purchase pills with money, Porter would "front them" by allowing Kathy and Aldridge to have the pills so long as they agreed to pay Porter later.  *Id.* at 529–30 (Kathy) (Page ID #5164–65).  This arrangement worked for a period, but eventually Aldridge and Kathy were unable to repay Porter.  *Id.* at 530 (Kathy) (Page ID #5165).  Tasha,[2] who also bought pills from Porter, informed Kathy that she could "work off" the debt that she and Aldridge had accrued by "cleaning and do[ing] sexual favors."  *Id.* at 534–36 (Kathy) (Page ID #5169–71).  Although Kathy did not initially tell Aldridge that she was cleaning and providing sexual favors to pay off their debt, she eventually informed him when she began going to Porter's house more often.  *Id.* at 554–55 (Kathy) (Page ID #5189–90).  Thereafter, Aldridge would regularly drive Kathy to Porter's house, take his pill, leave Kathy at

---

[1]To maintain anonymity, we refer to Kathy by her first name only.

[2]To maintain anonymity, we refer to Tasha by her first name only.

the house, and return to pick her up when she was finished. *Id.* at 551–52 (Kathy) (Page ID #5186–87). Porter occasionally fronted a pill for Aldridge, and Porter then contacted Kathy to pay for it with sexual acts. *See id.* at 604–05 (Kathy) (Page ID #5239–40).

As time went on, Porter increased the "price" of the pills. Initially, one sexual favor would "buy" two pills; however, over time this decreased to one sexual favor for one pill. *Id.* at 553–54 (Kathy) (Page ID #5188–89). Then Porter asked Kathy to bring her young daughters, who were eight and ten years old at that time, to his home to help her repay the debt under the guise that any sexual acts performed with Kathy's daughters would be fake. *Id.* at 566–70 (Kathy) (Page ID #5201–05). At the height of Aldridge's and Kathy's addictions, Kathy and her two daughters went to Porter's home to engage in sexual acts three or four times each week for an hour at a time, often driven by Aldridge. *Id.* at 575–76, 579–81 (Kathy) (Page ID #5210–11, 5214–16). Each time that Kathy and her daughters went to Porter's house to engage in sexual acts, Kathy and Aldridge would receive one or two pills and each of the daughters would receive roughly $20. *Id.* at 580–81 (Kathy) (Page ID #5215–16).

If Kathy declined to participate in sexual acts, Porter became agitated and threatened to hurt Kathy, her kids, and her family. *Id.* at 561 (Kathy) (Page ID #5196). For example, Porter taped Kathy's and Tasha's hands together and "put clothespins on [their] nipples," which left marks on Kathy's body. *Id.* at 561–63, 565 (Kathy) (Page ID #5196–98, 5200). Porter left "shotguns and guns" "[a]ll over the house," where anyone could see them. *Id.* at 562 (Kathy) (Page ID #5197). And "a couple of times" Porter shot a pistol next to Kathy's ear and told her that "[t]his is what could happen." *Id.* at 563 (Kathy) (Page ID #5198). Kathy suffered permanent hearing damage as a result. *Id.*

On one occasion, Kathy told Aldridge that she did not want to go to Porter's house, and they had an argument. *Id.* at 558 (Kathy) (Page ID #5193). At the time, Aldridge was "dope sick," became agitated, and was "yelling and screaming" at the two daughters and "throwing stuff at" Kathy. *Id.* at 624 (Kathy) (Page ID #5259). He locked Kathy in her room and demanded that she reach out to Porter. *Id.* at 625–26 (Kathy) (Page ID #5260–61). Kathy then reached out to Porter to buy some pills in order to deescalate the situation. *Id.* at 623–27 (Kathy) (Page ID #5258–62). On cross-examination, Kathy testified that Aldridge did not threaten her,

that he never said that he would hurt her or the girls, and that she would have gone to Porter's even if Aldridge had not asked because she also was "dope sick." *Id.* at 715–18 (Kathy) (Page ID #5350–53).

Aldridge was charged with conspiracy to sex traffic a child ("Count One"), conspiracy to sex traffic an adult by force ("Count Two"), and child sex trafficking ("Count Five"). R. 121 (Second Superseding Indictment ¶¶ 44–47, 52–53) (Page ID #746–48, 750). After a multi-day trial, Aldridge moved for judgment of acquittal at the close of the government's case-in-chief, arguing that there was insufficient evidence to prove that he was guilty of Count Two, the adult-sex-trafficking-by-force conspiracy. R. 666 (Trial Tr. at 967–70) (Page ID #5602–05). The district court orally denied the motion, reasoning that a jury could find that Aldridge had personally coerced Kathy to buy pills in exchange for sex acts. *Id.* at 969–70 (Page ID #5604–05). After deliberation, the jury found Aldridge guilty on all three counts. R. 523 (Jury Verdict at 65–68) (Page ID #2503–06).

At sentencing, the district judge applied two enhancements over Aldridge's objections: the enhancement for use of a computer to entice or offer and the vulnerable-victim enhancement. R. 667 (Sent'g Hr'g Tr. at 6–8) (Page ID #5622–24). The district judge sustained Aldridge's objection to the obstruction-of-justice enhancement. *Id.* at 7 (Page ID #5623). Aldridge's total offense level was 51—eight levels above the maximum total offense level of 43—and his criminal history category was III, which resulted in a sentencing guideline range of life imprisonment. *See id.* at 4, 7–9 (Page ID #5620, 5623–25) (declining to adopt two additional levels, as recommended by the PSR, for obstruction of justice and noting the total offense level as 43 because that is the maximum offense level under the guidelines); *see also* R. 586 (PSR ¶¶ 83–149) (Page ID #3646–57) (calculating the total offense level as 53, including the two additional levels for the obstruction-of-justice enhancement). The district court sentenced Aldridge to 324 months' imprisonment on each count, to be served concurrently, and a supervised-release term of life on each count, to be served concurrently. R. 614 (Judgment at 3–4) (Page ID #3877–78).[3] Aldridge filed a timely notice of appeal. R. 622 (Notice of Appeal at

---

[3]The district court announced a sentence of 327 months during the sentencing hearing, R. 667 (Sent'g Hr'g Tr. at 23) (Page ID #5639), but the written judgment on the docket reflects a 324-month sentence, R. 614 (Judgment

1) (Page ID #3900).

## II. ANALYSIS

Aldridge argues that the district court improperly denied his Rule 29 motion for judgment of acquittal on Count Two and that the district court incorrectly applied two sentencing enhancements. We will address each argument in turn.

### A. Rule 29

We "review[] de novo a district court's denial of a Rule 29 motion for judgment of acquittal based on the insufficiency of the evidence." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). "In reviewing the sufficiency of the evidence, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010) (quoting *United States v. Wallace*, 597 F.3d 794, 800 (6th Cir. 2010)). In so doing, we "must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (per curiam) (quotation omitted).[4]

Aldridge challenges the sufficiency of the evidence in support of his conviction on Count Two, the conspiracy to sex traffic an adult by force, threats of force, fraud, or coercion. D. 25

---

at 3) (Page ID #3877). Typically, "[w]e . . . treat the written judgment as controlling only if it were to have validly modified the oral sentence." *United States v. Penson*, 526 F.3d 331, 335 (6th Cir. 2008). Here, the district court's written judgment validly corrected an error in its oral sentence. "Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." Fed. R. Crim. P. 35(a). Aldridge's sentencing hearing was held on February 14, 2023, R. 667 (Sent'g Hr'g Tr. at 1) (Page ID #5617), and the district court signed the written judgment seven days later, on February 21, 2023, R. 614 (Judgment at 1) (Page ID #3875). The written correction aligns with the district court's oral statement that it was sentencing Aldridge to 27 years' imprisonment, which amounts to 324 months. R. 667 (Sent'g Hr'g Tr. at 23) (Page ID #5639). Accordingly, we treat the 324-month sentence as controlling.

[4]The government concedes that plain-error review does not apply and, therefore, has waived any argument in favor of its application. D. 33 (Appellee Br. at 14–15) (explaining that plain-error review does not apply because Aldridge filed his Rule 29 motion at the close of the government's case-in-chief and "[t]he close of evidence by the United States . . . was the close of all evidence"); *see also United States v. Williams*, 641 F.3d 758, 764 (6th Cir. 2011) ("[B]ecause the United States failed to request that we apply plain-error review, it has forfeited any argument that we should apply that standard . . . .").

(Appellant Br. at 21–28).[5] Under 18 U.S.C. § 1594(c), the government must prove beyond a reasonable doubt that (1) there was an agreement to violate 18 U.S.C. § 1591, (2) the defendant had knowledge of the essential objectives of the conspiracy, and (3) the defendant knowingly and voluntarily joined the conspiracy intending to advance its objectives. *See Sliwo*, 620 F.3d at 633; *United States v. Anthony*, 942 F.3d 955, 973 (10th Cir. 2019). As with any conspiracy, the government must put forth sufficient evidence that "links [the] [d]efendant to . . . the essential object of the conspiracy," *Sliwo*, 620 F.3d at 634 (quotation omitted), by proving the defendant's "knowledge of the conspiracy's objective and knowing participation in it," *Anthony*, 942 F.3d at 973.

Thus, in the § 1594(c) context, we must assess whether there was sufficient evidence to show that the defendant "shared his alleged coconspirators' purpose to" sex traffic one or more adults by force, threats of force, fraud, or coercion. *Anthony*, 942 F.3d at 973; *see also Sliwo*, 620 F.3d at 634. "Though the defendant need not know the existence or identity of all conspirators or the full extent of the conspiracy, he must have a general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator." *Anthony*, 942 F.3d at 973 (quotation omitted). Nonetheless, "[p]roof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *United States v. Warman*, 578 F.3d 320, 332 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

The object of the conspiracy here was sex trafficking of an adult by force, threats of force, fraud, or coercion in violation of § 1591. The statute provides two alternate methods for the government to prove a violation. First, "[t]o sustain a conviction for sex trafficking under 18 U.S.C. § 1591(a)(1), the government must prove beyond a reasonable doubt that the defendant knowingly 'recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], [or] maintain[ed] . . . by any means a person . . . knowing, . . . or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will

---

[5]Although Aldridge appears briefly to contend that there was insufficient evidence that he joined a conspiracy to sex traffic children, D. 25 (Appellant Br. at 17), he failed to develop the argument in any meaningful way. Therefore, the argument is forfeited. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *United States v. Elder*, 90 9.3d 1110, 1118 (6th Cir. 1996))).

be used to cause the person to engage in a commercial sex act[.]'" *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015) (quoting 18 U.S.C. § 1591(a)(1)). Alternatively, under § 1591(a)(2) the government must prove beyond a reasonable doubt that the defendant "knowingly . . . benefit[ted], financially or by receiving anything of value, from participation in a venture which has engaged in an act described" in 18 U.S.C. § 1591(a)(1). 18 U.S.C. § 1591(a)(2). Both subsections "target[] those who participate in sex trafficking" and therefore, the government is required to "prove that the defendant actually participated in a sex-trafficking venture." *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (emphasis omitted).

As used in the statute, "coercion" means "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2)(B). And, as it relates to the definition of "venture" in § 1591(a)(2), "[t]he defendant's mere membership in the venture is insufficient if he is ignorant of the venture's sex trafficking activities (and the means and methods thereof)." *Afyare*, 632 F. App'x at 285.

Aldridge was convicted of conspiring with Porter to sex traffic Kathy using force, threats of force, fraud, or coercion in violation of 18 U.S.C. § 1594(c). The government's theory of guilt is that Porter coerced Kathy to pay for drugs with sexual favors by "suppl[ying] Aldridge and Kathy with high-dose opioids, and when they could no longer pay, provid[ing] the opioids for free, on the pretense that they could pay him back later." D. 33 (Appellee Br. at 21). Once Aldridge and Kathy "were deep in debt," Porter "demanded payment in the form of sexual favors." *Id.* In other words, the government adopts the theory of coercion we found sufficient in *Mack*. 808 F.3d at 1081 (finding the evidence of coercion sufficient because the "defendant coerced the victims into prostituting themselves by" supplying free drugs and then "suddenly cut[ting] them off and demand[ing] payment" in the form of sexual favors).

Although the defendant in *Mack* is plainly analogous to Porter, *id.*, it is not clear that the same logic applies to Aldridge. Here, the drug debt was shared by Kathy and Aldridge, and it was referred to as such. D. 33 (Appellee Br. at 21); *see also, e.g.*, R. 665 (Trial Tr. at 534, 544, 569) (Kathy) (Page ID #5169, 5179, 5204). Thus, the object of the conspiracy was to coerce Kathy to exchange sex for drugs by exploiting Kathy's *and Aldridge*'s opioid addictions until

*they* were in severe debt to Porter.  *See* D. 33 (Appellee Br. at 21).  Aldridge could not have voluntarily joined a conspiracy intending to advance the conspiracy's goal of coercing Kathy, if it was the conspiracy's coercion—making both Kathy and Aldridge dope sick and then demanding payment—that caused Aldridge to further the conspiracy's goal.  *Mack*, therefore, does not provide an apt analogy to Aldridge.

Moreover, it is not sufficient, as the government suggests, that Aldridge knew that Kathy was exchanging sex for drugs and Aldridge facilitated those transactions because § 1591 is violated only if an adult is caused to engage in a commercial sex act by force, threat of force, fraud, or coercion.  Aldridge's knowledge and facilitation of Kathy's commercial sex acts is missing a connection to the aspect of § 1591 that subjects Aldridge to criminal liability—the coercion.  *See Sliwo*, 620 F.3d at 637 ("To fail to require a link to [the specific type of drug that was the object of a 21 U.S.C. § 846 conspiracy] would be highly problematic where [the] [d]efendant would be subject to wildly different levels of punishment if he joined a conspiracy that" committed a different crime); *see also Afyare*, 632 F. App'x at 277 ("Congress intended to criminalize two forms of sex trafficking it considered severe forms of trafficking in persons:  sex trafficking where the victim is under 18 years of age, and sex trafficking in which the act is induced by force, fraud, or coercion." (quotation omitted)).  In other words, it would not violate § 1594(c) for Aldridge to conspire to cause Kathy, an adult, to engage in commercial sex acts— unless Kathy's commercial sex acts were induced by force, threats of force, fraud, or coercion. *See* 18 U.S.C. §§ 1591, 1594(c).

Nonetheless, in this case there is sufficient evidence from which the jury could have found that Aldridge voluntarily joined the conspiracy with the intent to further its goal of coercing Kathy.  Kathy had marks on her body and suffered permanent hearing loss as a result of Porter's physical abuse and threats of violence.  R. 665 (Trial Tr. at 561–63, 565–66) (Kathy) (Page ID #5196–98, 5200–01).  During this period, she was living with Aldridge, and they were in a romantic relationship and shared a bed.  *Id.* at 566 (Kathy) (Page ID #5201).  Additionally, Porter left his guns in the open where Aldridge could see them whenever Aldridge was in Porter's home.  *Id.* at 562 (Kathy) (Page ID #5197).  From this evidence, the jury could have reasonably inferred that Aldridge knew that Porter was threatening or harming Kathy.

With this knowledge, Aldridge asked Porter to front him pills and then directed Porter to collect payment from Kathy.  *See, e.g.*, R. 679 (Gov. Exh. 1B at 21732) (Page ID #5972); *id.* at 8301 (Page ID #5957).  Although these transactions were sometimes facilitated by Kathy, occasionally Aldridge arranged for a transaction without Kathy's knowledge, and she found out after the fact when payment was due.  *See* R. 665 (Trial Tr. at 603–05) (Kathy) (Page ID #5238–40).  From this, the jury could reasonably conclude that Aldridge knew that Porter was threatening or physically harming Kathy if she did not obey, and Aldridge asked Porter to "front" him drugs in exchange for Kathy providing sexual favors.  This, in turn, put Kathy in the position of having to comply with Porter's requests or risk harm to herself.  Thus, there was sufficient evidence for the jury to find that Aldridge knowingly and voluntarily joined the conspiracy with intent to further its objective.  *See* 18 U.S.C. § 1591(e)(2)(B) (defining coercion as "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to . . . any person").

The same facts that were sufficient for a jury to conclude that Aldridge knowingly and voluntarily joined the conspiracy with intent to further its objective are also sufficient for a jury to conclude that the conspiracy used coercion.  As explained above, the jury could have reasonably concluded that when Aldridge asked Porter to "front" him pills without Kathy's knowledge, he put Kathy in the position of having to comply with Porter's sexual requests or risk harm to herself.  *See Mack*, 808 F.3d at 1081; 18 U.S.C. § 1591(e)(2)(B).  Taken together, this is sufficient to affirm Aldridge's conviction on Count Two.

**B.  Sentencing**

Next, Aldridge challenges the reasonableness of his sentence, arguing that the district court incorrectly applied the vulnerable-victim and use-of-a-computer enhancements.  There are two aspects of reasonableness in the sentencing context:  procedural and substantive reasonableness.  *United States v. Gates*, 48 F.4th 463, 468–69 (6th Cir. 2022).  Here, Aldridge challenges only procedural reasonableness.  "Procedural reasonableness requires that a district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the [18 U.S.C.] § 3553(a) factors and adequately explain the chosen sentence—including an explanation for any variance from the guidelines range."  *United States v. Morgan*, 687 F.3d 688,

693 (6th Cir. 2012) (quoting *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008)).  We review a district court's sentencing decision under the abuse-of-discretion standard.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  The district court's legal conclusions, including its "interpretation of the [g]uidelines," are reviewed de novo, and its factual findings are reviewed for clear error.  *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010).  For the reasons explained below, the district court properly applied the challenged enhancements and, even if it had not, any error was harmless.

### 1. Vulnerable Victim

First, the district court correctly applied the vulnerable-victim enhancement.  Two levels are added to a defendant's total offense level "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  A vulnerable victim is any individual "who is a victim of the offense of conviction and any conduct for which the defendant is accountable" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1, cmt.2.  "[D]rug addiction, standing alone, cannot serve as the basis for applying the [vulnerable-victim] enhancement."  *United States v. Volkman*, 797 F.3d 377, 398 (6th Cir. 2015).  If, however, the victim is vulnerable due to drug addiction and additional traits or circumstances, then application of the enhancement is appropriate.  *See id.* at 398–99 (finding the enhancement applicable because the victims suffered from drug addiction and various mental-health conditions).  Although the defendant is not required to "target" the victims because of their vulnerability, *United States v. Brawner*, 173 F.3d 966, 973 (6th Cir. 1999), there must be some reason the vulnerability makes the victim "particularly susceptible to the criminal conduct," U.S.S.G. § 3A1.1 cmt.2; *see also United States v. Wilson*, 561 F. App'x 451, 452–53 (6th Cir. 2014) (finding the "incarcerated victims were particularly susceptible to [the defendant's]" fraudulent offer of legal services because the victims had "limited education, cognitive abilities, and ability to understand the legal technicalities of their case, and" maintained "limited communication with . . . the outside world").

Here, Kathy's physical and mental conditions, as well as her financial dependence on Aldridge, place her squarely within the vulnerable-victim category.  Kathy became highly

addicted to opioids such that she needed three or four pills per day or else she would get "dope sick," which "felt like . . . dying." R. 665 (Trial Tr. at 522, 527–28) (Kathy) (Page ID #5157, 5162–63). She was prescribed medication for mental-health issues, but she stopped taking her medication when she was using opioids. *Id.* at 713–14 (Kathy) (Page ID #5348–49). Additionally, Kathy was diagnosed with fetal alcohol syndrome when she was young and, as a result, has difficulty understanding and retaining information. *Id.* at 497–98 (Kathy) (Page ID #5132–33). And, while in a relationship with Aldridge, Kathy had brain surgery to remove a tumor from her pituitary gland. *Id.* at 713, 721 (Kathy) (Page ID #5348, 5356).

If this were not enough, Kathy was a single mother to two young daughters who lived with Aldridge and his family. *Id.* at 499–502, 506–09 (Kathy) (Page ID #5134–37, 5141–44). Kathy was not employed during the charged time period and, therefore, relied on Aldridge's salary and his family's home. *Id.* at 506–09 (Kathy) (Page ID #5141–44). Taken together, Kathy's reliance on Aldridge for an income and housing for her two young daughters as well as her addiction, mental health, and fetal alcohol syndrome, made her particularly susceptible to being coerced by Aldridge to engage in commercial sex acts. *See Wilson*, 561 F. App'x at 453. Accordingly, the district court properly applied this enhancement.

### 2. Use of a Computer

Likewise, the district court correctly determined that the enhancement for use of a computer is applicable. Under U.S.S.G. § 2G1.3(b)(3)(B), two levels are added to a defendant's total offense level if the offense involved the use of a computer to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor." This enhancement "requires the inducement of a third party" to engage in sexual acts with a minor, "rather than the inducement of the minor." *United States v. Murphy*, 530 F. App'x 522, 524 (6th Cir. 2013) (emphasis omitted). Thus, the enhancement "does not apply without three people—the defendant, the minor, and the third person who is being enticed." *United States v. Lay*, 583 F.3d 436, 448 (6th Cir. 2009). Here, the district court applied this enhancement, as recommended by probation, to the sentencing-calculation groups for Count 1A and Count 1B, which pertain to Kathy's daughters. *See* R. 586 (PSR ¶¶ 92–93, 109–110) (Page ID #3647–48, 3650). Thus, there must be evidence that Aldridge used a computer to "entice, encourage, offer, or solicit a

person to engage in prohibited sexual conduct with" each of Kathy's daughters.   U.S.S.G. § 2G1.3(b)(3)(B).

Here, the plain text of the enhancement supports its application.   There were several online conversations between Aldridge and Porter during which Aldridge facilitated a transaction by directing Porter to contact Kathy.   And, throughout the charged time period, Aldridge regularly drove Kathy and her daughters to Porter's house, received a pill, left Kathy and her daughters at Porter's home, and returned later to pick up Kathy and her daughters.   R. 665 (Trial Tr. at 580–82) (Kathy) (Page ID #5215–17).   For example, on July 13, 2019, Aldridge messaged Porter asking if Porter "ever g[o]t anything."   R. 679 (Gov. Exh. 1C at 21732) (Page ID #5972). Porter said that he did and asked, "where's kathy."   *Id.*   Aldridge responded that she was "[r]ight here" and that he would "have her message" Porter.   *Id.*   Minutes later, Kathy messaged Porter and arranged for her daughters and herself to go to Porter's home.   R. 679 (Gov. Exh. 1B at 8301–03) (Page ID #5957–59).   Porter offered to pick up Kathy and her daughters, agreed to bring Aldridge's pill, and instructed Kathy, her daughters, and Aldridge to meet him at the end of Aldridge's driveway.   *Id.* at 8303 (Page ID #5959); R. 665 (Trial Tr. at 621–23) (Kathy) (Page ID #5256–58).

Put simply, Aldridge and Kathy regularly messaged Porter to "offer" Kathy's daughters in exchange for the opioids Aldridge and Kathy sought.   "Based on the text of the Guidelines alone, [this] enhancement clearly applies to [Aldridge's] conduct."   *United States v. Cramer*, 777 F.3d 597, 604 (2d Cir. 2015) (affirming application of the enhancement because the defendant posted advertisements containing pictures of minors and offering their sexual services to third parties at a cost); *see also Murphy*, 530 F. App'x at 528 (finding the district court properly applied this enhancement to a defendant who used pictures of a minor in online advertisements for an escort business).

Aldridge's arguments do not alter this analysis.   Aldridge contends that there is insufficient evidence to support application of this enhancement because he did not know what was happening with the two daughters.   D. 25 (Appellant Br. at 31); D. 34 (Reply Br. at 11–12). Aldridge explains that Kathy testified "that none of the Facebook messages exchanges dealt with anything going on with her daughters," D. 25 (Appellant Br. at 31), and that she never told

Aldridge that her daughters were engaging in sexual acts when they went to Porter's home, D. 34 (Reply Br. at 11–12). This argument, however, was presented at trial and rejected by the jury, which rendered guilty verdicts on the two child-sex-trafficking counts that Aldridge does not challenge on appeal. *See* R. 523 (Jury Verdict at 65–68) (Page ID #2503–06).

Aldridge also argues that U.S.S.G. § 2G1.3(b)(3)(A) is inapplicable because he did not communicate directly with a minor or someone who exercises "supervisory control" over the minor to facilitate the travel of a minor to engage in prohibited sexual conduct. D. 25 (Appellant Br. at 29–30). He may be correct under § 2G1.3(b)(3)(A); however, the district court applied § 2G1.3(b)(3)(B). *See* R. 586 (PSR ¶¶ 92–93, 109–110) (Page ID #3647–48, 3650); R. 667 (Sent'g Hr'g Tr. at 7) (Page ID #5622–23) ("I just think . . . that [defense counsel is] reading the – it's 2G1.3(b)(3)(B) too narrowly."). Under 2G1.3(b)(3)(B), Aldridge was required to "entice" a third person other than the minor, *see Lay*, 583 F.3d at 448, and therefore, this argument lacks merit. Accordingly, the district court properly applied the § 2G1.3(b)(3)(B) enhancement.

### 3. Harmless Error

Even if the district court erred in applying the challenged enhancements, any error was harmless. "[A] remand for an error at sentencing is required unless we are certain that any such error was harmless—*i.e.* any such error 'did not affect the district court's selection of the sentence imposed.'" *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). If the guidelines range "from which the district court must begin its sentencing analysis is incorrect, then" it is unlikely that the error is harmless. *United States v. Anderson*, 526 F.3d 319, 330 (6th Cir. 2008). The government bears a heavy burden to "persuade [us] that the district court would have imposed the same sentence absent the erroneous factor." *Id.* (quoting *Williams*, 503 U.S. at 203). This is the rare case in which the government has met this heavy burden, in part because Aldridge concedes that any sentencing error would be harmless if we affirm the district court's ruling on his motion for judgment of acquittal. *See* D. 25 (Appellant Br. at 17 n.1).

Despite the guidelines range being life, the district court sentenced Aldridge to 27 years' imprisonment. R. 667 (Sent'g Hr'g Tr. at 23) (Page ID #5639). And the district court explained

that its sentencing decision was related primarily to the child-sex-trafficking counts and Aldridge's personal characteristics; the court did not mention either challenged sentencing enhancement as particularly relevant to its decision making. *Id.* at 18–23 (Page ID #5634–39). Thus, there is nothing in the record to suggest that the vulnerable-victim enhancement or the use-of-a-computer enhancement impacted the district court's sentencing decision in any meaningful way, the district court's original sentence was below the guidelines range, and Aldridge concedes that even if the district court erred, he would be subject to the same guidelines range of life. "[W]e are[, therefore,] certain that any [sentencing] error" in this case "was harmless" in that it "did not affect the district court's selection of the sentence imposed." *Hazelwood*, 398 F.3d at 801 (quoting *Williams*, 503 U.S. at 203); *cf. United States v. Vicol*, 514 F.3d 559, 562 (6th Cir. 2008) (finding a sentencing error was not harmless because "the record and transcript of the . . . sentencing hearings show that the district court was concerned with" the issues that the defendant challenged).

## III. CONCLUSION

We therefore **AFFIRM** the judgment of the district court.