NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0283n.06

Case No. 24-1480

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 09, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| MCKHAELA KATELYNN MCNAMARA, | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |

Before: SUTTON, Chief Judge; CLAY and THAPAR, Circuit Judges.

SUTTON, Chief Judge. A 70-year-old woman, warned of a "virus" on her iPad, hands over hundreds of thousands of dollars in cash to a "federal agent" outside a dollar store. A real federal agent soon learns about the fake federal agent, McKhaela McNamara, and discovers that the 70-year-old was not her only mark. McNamara pleads guilty to taking part in an $11-million wire-fraud conspiracy. Did her crime involve a "vulnerable victim" for purposes of the Sentencing Guidelines? It did, prompting us to affirm.

The scheme worked this way. Conmen spammed elderly Americans with pop-up alerts, emails, and phone calls. They convinced their targets that they had a virus on their computer, that their bank accounts had been compromised, or that they had been identified in a criminal investigation—or some combination of the three. Then they offered to help.

McNamara, a native of Flint, joined the scheme in late 2021 after an introduction by a family friend. The friend supervised the conspiracy's American "runners," who collected proceeds directly from victims for $1,000 per trip. R.212 at 8 ¶ 26. What McNamara was told at the outset is not clear. But she soon realized that she was "stealing from old people." R.212 at 31 ¶ 163. She collected cash from at least four victims—one in Michigan (age 70), one in Arizona (age 82), one in Montana (age unknown), and one in Wisconsin (age unknown)—and at least two of the victims believed she was a federal agent.

The record before us contains details about one of the victims, J.K., a 70-year-old woman from rural Michigan. One day a spam pop-up appeared on J.K.'s iPad. It told her that her iPad had a virus and that she had to call "tech support." R.212 at 9 ¶ 29. J.K. did as told. When she made the call, the man answering the phone informed her that it was not just her iPad she had to worry about; her bank account had been compromised, too. As if on cue, she received a call from a man who claimed to be a fraud-department manager at her bank. He told her that federal law enforcement was involved, that she could not talk to anyone about the matter, and that hackers had already stolen $77,500 from her account. To make sure they did not take any more, he explained, she would have to withdraw the rest of the money in her account. At first, he told her to use a wire transfer, but the bank put a hold on this (highly suspicious) transaction. He then told her to "forget about the wires" and "withdraw as much cash as she could" to turn over to a "federal agent" for safekeeping. R.212 at 10 ¶ 33.

Enter McNamara. By this point, J.K. had withdrawn $30,000 in cash from two bank branches. She had been told that agent Oliver Davis would collect the funds from her at her local Family Dollar, and that she should give him the funds only if he knew a secret passcode. J.K. met McNamara there. McNamara, posing as Davis, told her the passcode. And J.K. provided her with

2

the cash. This happened six times over one and a half months. McNamara came to J.K.'s small town, met her outside a local store, shared the passcode, and took tens of thousands of dollars—$398,000 in total.

The scheme ended when the scammers overstepped. The fake bank employee told J.K. to sell off her investments and transfer the funds to new accounts, prompting a meeting with her financial advisor. He told her that she had been a victim of fraud and told her to call the police.

A federal investigation followed, leading to an indictment of McNamara and six of her U.S.-based co-conspirators. McNamara pleaded guilty to conspiring to commit wire fraud. Over her counsel's objection, the district court added two points to McNamara's offense level because J.K. was a "vulnerable victim." U.S.S.G. § 3A1.1(b)(1). That led to a Guidelines range of 51 to 63 months. The district court sentenced her to 51 months. She appealed.

At issue is whether the district court properly applied the Sentencing Guidelines' vulnerable-victim enhancement. The enhancement applies if McNamara "knew or should have known" that J.K. "was a vulnerable victim," *id.*—a person who was "particularly susceptible" to the scam because of her "age" or "mental condition," *id.* § 3A1.1(b) cmt. n.2; *see United States v. Aldridge*, 98 F.4th 787, 797–98 (6th Cir. 2024). We review this fact-bound question for clear error. *United States v. O'Lear*, 90 F.4th 519, 536 (6th Cir. 2024).

The district court did not clearly err. This was a brazen scam, one premised on the unusual willingness of J.K. and others to trust those they met online or over the phone. She believed that a federal agent would ask her not only to hand over hundreds of thousands of dollars in cash but also do so outside her local dollar store. The scheme set a stage for the credulous, to say nothing of the "average person" upon whom a scammer could prey. *United States v. Lawson*, 128 F.4th 243, 251 (4th Cir. 2025); *see also United States v. Stokes*, 392 F. App'x 362, 371 (6th Cir. 2010).

3

It was quite reasonable for the district court to conclude that the scammers' "trap" relied on unique vulnerabilities of the elderly—their limited computer skills and (sometimes) decreasing capacities to distinguish "honesty from fraud." R.296 at 15.

Also reasonable was the court's finding that McNamara knew about those vulnerabilities. She admitted as much in her plea. "At all times," she said, she "knew" that the scheme required her to "defraud elderly victims." R.119 at 8. In J.K., she saw these vulnerabilities firsthand. J.K. was willing to hand hundreds of thousands of dollars in cash to a woman she believed was a federal agent named Oliver Davis, all outside a dollar store. And not just once. That J.K. fell for this scam six times was surely proof to McNamara, if any more was needed, that this victim was vulnerable "in a way and to a degree not typical of the general population." *United States v. Jackson*, 95 F.3d 500, 508 (7th Cir. 1996). The district court properly applied the enhancement.

McNamara counters that age alone does not suffice to justify the enhancement. True, but the district court did not rely on age alone. It focused on the link between J.K.'s age and her "susceptib[ility] to [the] criminal conduct," R.296 at 15, just as the Guidelines require, *Lawson*, 128 F.4th at 251.

McNamara argues that any link between age and vulnerability would rely on the "tautology" that "the victims were vulnerable because they were victims" of this scheme. Appellant's Br. 19. But this enhancement did not turn on a tautology. How a scam works often sheds light on the vulnerability of its victims. McNamara was no Madoff. That her victims fell for this *particular* scheme speaks volumes about their technological sophistication and mental acuity. Only a person of unusual naivety could believe that a bank employee would instruct her to liquidate her savings. *See United States v. Iriri*, 825 F.3d 351, 353 (7th Cir. 2016).

*United States v. Hess* does not help McNamara. 106 F.4th 1011 (10th Cir. 2024). After the owner of a funeral home and her mother promised families that their loved ones would be cremated, they instead sold their body parts on the black market. *See id.* at 1018–19. The Tenth Circuit held that the families were not necessarily vulnerable victims because it was unclear whether their grief "made it any easier" for the defendants to pull off their fraud. *Id.* at 1032–33. Quite the opposite here. It was precisely because J.K. was unusually credulous that McNamara was able to steal her money.

McNamara argues that no evidence shows that she *targeted* the vulnerable. But the enhancement requires knowledge, not intent. *United States v. Curly*, 167 F.3d 316, 319 (6th Cir. 1999); *see also Aldridge*, 98 F.4th at 797. What matters is that McNamara knew, or at least had reason to know, that J.K. was vulnerable and went ahead with the scheme anyway.

McNamara claims that we should review the propriety of the enhancement with fresh eyes. True, we do not defer to the district court as to McNamara's purely legal arguments, such as whether age alone is sufficient to justify the enhancement or whether the enhancement requires intent. *See O'Lear*, 90 F.4th at 536. But most of her arguments are not so abstract or legal. They instead focus on whether J.K. was a vulnerable victim, a mixed question we review for clear error. *See id.* The standard of review at all events does not drive this case. Even if we reviewed McNamara's entire case afresh, we would come out the same way.

We affirm.