FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**April 15, 2025**

**Christopher M. Wolpert
Clerk of Court**

———————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GERMAINE COULTER, SR., a/k/a Slim,

    Defendant - Appellant.

No. 24-6026

———————————————

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:18-CR-00156-D-1)**

———————————————

John M. Bowlin, Bowlin & Schall LLC, Greenwood Village, Colorado, for Defendant-Appellant.

Jackson D. Eldridge, Assistant United States Attorney (Robert J. Troester, United States Attorney, with him on the brief), United States Attorney's Office, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

———————————————

Before **TYMKOVICH**, **CARSON**, and **FEDERICO**, Circuit Judges.

———————————————

**TYMKOVICH**, Circuit Judge.

———————————————

Germaine Coulter was found guilty of child sex trafficking and conspiracy to commit child sex trafficking and was sentenced to 360 months of imprisonment. The district court ordered Coulter to pay a total of $386,000 in restitution to the two victims

he harmed.  Coulter appeals, arguing the government fails to demonstrate he is the but-for cause of the victims' injuries.  He further challenges the district court's determination of the restitution award amount, claiming it is unsupported by evidence in the record.

We **AFFIRM**.  The government met its burden in showing Coulter was a but-for cause of the victims' losses.  The district court, moreover, did not abuse its discretion in ordering Coulter to pay ten years of ongoing individual therapy, psychiatric treatment, and medication for the two victims based on the evidence presented in the record.

# I.    Background[1]

## A.    *Procedural History*

Coulter was charged with: (1) conspiracy to commit child sex trafficking of Doe 1 and Doe 2; (2) child sex trafficking with respect to Doe 1; and (3) child sex trafficking with respect to Doe 3.  At trial, he was ultimately found guilty on Counts One and Two by a jury verdict and was subsequently sentenced to 360 months of imprisonment on each count, to be served concurrently.[2]  Coulter appealed his conviction and sentence; but we affirmed both the guilty verdict and his sentence.

---

[1] The facts surrounding this case were discussed in full in Coulter's previous appeal and are well known to the parties.  *See United States v. Coulter*, 57 F.4th 1168, 1176 (10th Cir.), *cert. denied*, 143 S. Ct. 2627 (2023).  We therefore incorporate the facts included in our previous opinion and present only an abbreviated version of the factual and procedural history as relevant to this appeal.  We also note the record is sealed in this matter.

[2] Elizabeth Andrade, Coulter's co-defendant, pleaded guilty to a one-charge superseding information charging her with conspiracy to commit child sex trafficking of Doe 1 and Doe 2.  Andrade's plea agreement requires her to pay restitution to all victims of her relevant conduct.  She was ultimately sentenced to 78 months of imprisonment and five years of supervised release.  Andrade did not join Coulter's appeal.

After the appeal was resolved, the government filed a motion for restitution, requesting $1,145,900 for Doe 1 and $967,000 for Doe 2—a total sum of $2,112,900. The government also requested that Coulter and Andrade pay a $5,000 special assessment under the Justice for Victims of Trafficking Act (JVTA) for each count of conviction. The government's motion relied on expert reports by a psychologist, Dr. Charles David Missar.

Before Coulter responded to the motion, the district court stayed briefing while this Circuit considered an appeal on a parallel issue: whether the government must establish a defendant's actions are the but-for and proximate cause of a victim's injuries for purposes of restitution under the Trafficking Victims Protection Reauthorization Act (TVPRA). *See United States v. Anthony*, 22 F.4th 943 (10th Cir. 2022) ("*Anthony II*"); *see also United States v. Anthony*, 942 F.3d 955 (10th Cir. 2019) ("*Anthony I*").[3] In *Anthony I* and *Anthony II*, we answered that question affirmatively. *See Anthony II*, 22 F.4th 943 (affirming the district court's decision to not award restitution because the government failed to meet the but-for causation requirement).

### B.    Expert Reports and Restitution Hearing

After this Circuit's decision in *Anthony II*, the parties filed supplemental briefs and responses addressing the restitution issue. Both briefs largely refer to Dr. Missar's two expert reports, which each provide an assessment of Doe 1 and Doe 2's emotional functions and mental health, as well as their respective trauma sustained from being

---

[3] *Anthony I* and *Anthony II* also involved expert reports by Dr. Missar.

3

sexually trafficked. *See* App. Vol. II, 246–53 (Doe 1 Report); *id.* at 82–93 (Doe 2 Report). The expert reports rely on interviews with the two victims, transcripts and documents from Coulter's trial, medical records, victim impact statements, and various pleadings and orders filed in this case.

Dr. Missar opined that Doe 1 suffers from post-traumatic stress disorder (PTSD), severe depression, and dysthymia (a persistent depressive disorder) from the trauma of being sexually trafficked. He noted the "nexus between the emergence of these symptoms and her sexual trafficking is quite clear, and the ongoing symptoms[4] . . . are directly linked . . . to that trafficking." *Id.* at 252. Based on his assessment, Dr. Missar recommended Doe 1 needs various types of treatment, such as two intensive years and then a lifetime of both individual therapy and psychiatric treatment. He also opined that "the impact that sex trafficking had on [Doe 1] has . . . impaired her ability to work to her potential" and "interfered with her ability to continue her education." *Id.* at 253. Dr. Missar therefore recommended lost work wages based on information from the Social Security Administration as to "the difference in lifetime earnings between those with a high school diploma compared to having some college work." *Id.* Adding a lifetime of medication treatment, Dr. Missar calculated the following damages:

---

[4] Dr. Missar noted Doe 1's symptoms of trauma due to sex trafficking include "PTSD flashbacks to sex trafficking events, prolonged fear of [Coulter] to the point of anxiety being in public, [and] ongoing struggles with health and personal safety." App. Vol. II, 252.

| | | | |
|---|---|---|---|
| Intensive individual therapy | (2 years x 50 wk/yr x 2 times/wk x $150/hr) | = $ | 30,000.00 |
| Ongoing individual therapy | (59 years x 50 wk/yr x $150/hr) | = $ | 442,500.00 |
| Group therapy | (10 years x 50 wk/yr x $100/hr) | = $ | 50,000.00 |
| Psychiatrist | (2 years x 12 visits/yr x $200/hr) | = $ | 4,800.00 |
| Psychiatrist | (59 years x 2 visits/yr x $200/hr) | = $ | 23,600.00 |
| Medications | (59 years x $5,000/yr) | = $ | 295,000.00 |
| Lost work wages | | = $ | 300,000.00 |
| | | | |
| Total | | $ | 1,145,900.00 |

Dr. Missar separately opined that Doe 2 suffers from PTSD, dysthymia, and mood disorders due to the trauma of being sexually trafficked. He noted Doe 2's attention-deficit/hyperactivity disorder (ADHD) symptoms and learning disorder likely predated her sex trafficking, but were also exacerbated by it. *Id.* at 93. Dr. Missar thus recommended restitution for "tutoring to help her through any academic work that she is able to do over the next several years." *Id.* Based on her injuries, Dr. Missar also advised Doe 2 similarly requires various types of treatment, including two intensive years followed by a lifetime of both individual therapy and psychiatric treatment. Adding a lifetime of medication treatment, Dr. Missar submitted the following calculated damages for Doe 2:

| | | | |
|---|---|---|---|
| Intensive individual therapy | (2 years x 50 wk/yr x 2 times/wk x $150/hr) | = $ | 30,000.00 |
| Ongoing individual therapy | (61 years x 50 wk/yr x $150/hr) | = $ | 457,500.00 |
| Group therapy | (10 years x 50 wk/yr x $100/hr) | = $ | 50,000.00 |
| Psychiatrist | (2 years x 12 visits/yr x $200/hr) | = $ | 4,800.00 |
| Psychiatrist | (61 years x 2 visits/yr x $200/hr) | = $ | 24,400.00 |
| Medication – mood | (61 years x $4,000/yr) | = $ | 244,000.00 |
| Medication – ADHD | (61 years x $2,400/yr) | = $ | 146,400.00 |
| Tutoring | (4 years x 50 wk/yr x 2x/week x $25/hr) | = $ | 10,000.00 |
| | | | |
| Total | | $ | 967,100.00 |

On December 28, 2023, the district court held a restitution hearing in which Dr. Missar appeared as the only witness. Dr. Missar testified about his understanding of the

5

victims' background and history, as well as the sustained trauma and injuries caused by Coulter. He also responded to questions related to the recommended treatment and therapy for Doe 1 and Doe 2.

Specifically for Doe 1, Dr. Missar acknowledged that he was aware Doe 1 had other traumatic life experiences, including being the victim of sexual molestation by a family member at the age of seven. Even so, Dr. Missar opined Coulter's sexual trafficking of Doe 1 directly caused Doe 1's PTSD, severe depression, and dysthymia; he explained "the nexus that Doe 1 drew, both in her victim impact statement as well as . . . in the subsequent interview, she linked *specifically and repeatedly* to the experience with [Coulter] and [Andrade], not to any prior traumatic experience." App. Vol. III, 50 (emphasis added). Dr. Missar clarified Doe 1's "psychiatric symptoms . . . are directly related to the traumatic experiences she had as a result of the sex trafficking experience, and the recommendations . . . made are specific to that" and not to any prior trauma or abuse, such as a previous inpatient hospitalization. *Id.* at 50–51.

As to Doe 2, Dr. Missar opined her PTSD, dysthymia, and mood disorder were caused specifically by her sexual trafficking experience. *Id.* at 61, 118–19. He noted "the presence of [her] depressive symptoms[5] specifically relate[] to problems with sexual trafficking and the trauma she sustained and identified as a result . . . ." *Id.* at 57. He specified that although Doe 2's reading disorder and ADHD—such as "problems with

---

[5] Dr. Missar stated such symptoms include problems with intrusive thoughts, nightmares, flashbacks, sleep problems, appetite disturbance, and problems with helplessness, hopelessness, worthlessness, and anxiety. App. Vol. III, 57. He also noted Doe 2's has "problems concentrating, with periodic suicidal ideation." *Id.* at 59.

concentration and attention"—predate Coulter's offense conduct, they were exacerbated by the sexual trafficking trauma, evidenced by Doe 2's attempts "to focus on something or try to maintain concentration . . . but be unable to do so because of the presence of traumatic experiences [and] flashbacks . . . that [are] directly related to the sexual trafficking experiences." *Id.* at 58, 61. Dr. Missar explained that he believed Doe 2 may have a "rule-out condition for bipolar disorder"[6] due to the trauma of sexual trafficking because "there is no family history . . . of bipolar disorder in her family" and the disorder "can often be kindled by a series of negative life events." *Id.* at 59–60. When asked by the government why he concluded Doe 2's conditions were caused by the sex trafficking as opposed to the environment in which Doe 2 was raised, which included exposure to sexual trafficking, Dr. Missar opined that there was a nexus between her symptoms and the experiences she had of being trafficked. *Id.* at 61. For example, Dr. Missar noted Doe 2's statement that she did not have flashbacks to her earlier moments in life, but to "specific . . . experiences of sex trafficking and the aftermath of it." *Id.* at 62.

Near the close of his redirect examination, Dr. Missar responded that the restitution estimates for Doe 1 and Doe 2 are based on their respective diagnoses and treatments, and his "degree of certainty" that those are "linked specifically to the sex trafficking" in this case. *Id.* at 116–17.

---

[6] Dr. Missar clarified he "did not have sufficient indication from [his] analysis" to formally diagnose Doe 2 with bipolar disorder, and thus left the condition as one that would need to be followed up over time by a treating provider. App. Vol. III, 60.

## C.    Restitution Judgment

In a written order, the district court awarded restitution for ten years of therapy, psychiatric treatment, and medication in the amount of $198,000 for Doe 1 and $188,000 for Doe 2, respectively.  In so doing, the district court considered Dr. Missar's evaluation, related evidence and testimony presented at the restitution hearing and at trial, and the record as a whole.

For Doe 1, the district court rejected Defendants'[7] argument that the government fails to show but-for causation because Doe 1 was previously "a prostitute" and has past trauma from being molested by a family member.  App. Vol. I, 118.  The district court considered that Doe 1 did indeed have other potential sources of trauma but agreed nonetheless with Dr. Missar that Defendants were the but-for causes of Doe 1's trauma as relevant to this case.  *Id.* at 119 (noting that a case involving the sex trafficking of minors "will not necessarily involve individuals possessing a blank slate, unaffected by any sort of trauma before being trafficked" and finding it "unlikely that the Tenth Circuit, in requiring the government to establish but-for and proximate causation, intended to disqualify every trafficking victim who, at some point in their life, suffered from trauma unrelated to the offense conduct.").

The district court accepted Dr. Missar's recommendation that Doe 1 would need, for the various traumas inflicted by Defendants, intensive individual therapy for two years, ten years of group therapy, and two years of monthly psychiatric treatment.  The

---

[7] This opinion refers to Coulter and Andrade together as Defendants.

district court, however, found Dr. Missar's recommendation for ongoing therapy, psychiatric treatment, and medication for Doe 1's lifetime to be "overly speculative"; instead, the court limited the restitution award to cover the costs for such services to ten years, including the intensive sessions of individual therapy and psychiatric treatment. It declined to award any amount for lost work wages because Dr. Missar's recommendation rested on several assumptions, such as Doe 1 never completing any college coursework. The court found Doe 1 to be "entitled to $198,000 in restitution to account for the . . . expenses set forth in Dr. Missar's evaluation[.]" *Id.* at 120.

| Intensive individual therapy | 2 years x 50 weeks/year x 2 times/week x $150/hour | $30,000 |
|---|---|---|
| Ongoing individual therapy | 8 years x 50 weeks/year x $150/hour | $60,000 |
| Group therapy | 10 years x 50 weeks/year x $100/hour | $50,000 |
| Psychiatrist | 2 years x 12 visits/year x $200/hour | $4,800 |
| Psychiatrist | 8 years x 2 visits/year x $200/hour | $3,200 |
| Medications | 10 years x $5,000/year | $50,000 |
| Lost work wages | None | $0 |
| | | $198,000 |

As for Doe 2, the district court noted, contrary to Andrade's arguments, Doe 2 is indeed a victim under TVPRA because she was "harmed as a result" of Defendants' crimes. It thus determined Defendants were the but-for and proximate cause of Doe 2's trauma. The district court accepted Dr. Missar's recommendation that like Doe 1, Doe 2 would need two years of intensive individual therapy, ten years of group therapy, and two years of monthly psychiatric treatment to address the various traumas inflicted by Defendants. For the same reasons as Doe 1, the district court held Dr. Missar's recommendation for ongoing therapy and psychiatric treatment over her lifetime to be "overly speculative." Accordingly, like Doe 1, restitution was limited to cover ten years

of individual therapy, group therapy, psychiatric treatment, and medication, with the first

two years of individual therapy and psychiatric treatment to be more intensive. The

district court also declined to award any amount for ADHD medication or tutoring

because Doe 2's ADHD diagnosis and reading disability predate her involvement with

Defendants. The total restitution for Doe 2 was thus calculated to be $188,000,

accounting for the expenses set forth in Dr. Missar's evaluation. *Id.* at 123.

| | | |
|---|---|---|
| Intensive individual therapy | 2 years x 50 weeks/year x 2 times/week x $150/hour | $30,000 |
| Ongoing individual therapy | 8 years x 50 weeks/year x $150/hour | $60,000 |
| Group therapy | 10 years x 50 weeks/year x $100/hour | $50,000 |
| Psychiatrist | 2 years x 12 visits/year x $200/hour | $4,800 |
| Psychiatrist | 8 years x 2 visits/year x $200/hour | $3,200 |
| Medication – Mood | 10 years x $4,000/year | $40,000 |
| Medication – ADHD | None | $0 |
| Tutoring | None | $0 |
| | | $188,000 |

The district court determined a hybrid joint-and-several restitution approach was

appropriate and apportioned the restitution amount between Coulter and Andrade based

on their respective contributions to the victims' injuries:

| Doe 1 | Doe 2 |
|---|---|
| Mr. Coulter: $198,000 | Mr. Coulter: $188,000 |
| Ms. Andrade: $69,300 | Ms. Andrade: $65,800 |

Finally, the district court imposed a $5,000 per-count special assessment on

Coulter and Andrade pursuant to the JVTA.

## II.    Discussion

Coulter argues the district court erred in finding the government met its burden of

showing he was a but-for cause of the victims' injuries. He also asserts the district

court's award of ten years of therapy, psychiatric treatment, and medication is unsupported by any evidence. He does not appeal the JVTA assessment or the hybrid joint-and-several restitution approach imposed by the district court. We consider his arguments in turn.

### A.    Standard of Review

"We review the legality of a restitution order de novo, the district court's factual findings for clear error, and the amount of restitution for abuse of discretion. A district court abuses its discretion if it orders a restitution amount based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Anthony II*, 22 F.4th at 950 (citations omitted).

A district court may order restitution "only for losses actually resulting from the offense of conviction." *Id.*; *see United States v. Quarrell*, 310 F.3d 664, 680 (10th Cir. 2002) ("A restitution order must be based on *actual* loss."). The government must prove those losses, and the amount of such losses, by a preponderance of the evidence. *Anthony II*, 22 F.4th at 950 (citing 18 U.S.C. § 3664(e)); *United States v. Serawop*, 505 F.3d 1112, 1117 (10th Cir. 2007) ("Any dispute as to the proper amount . . . of restitution shall be resolved by the court by the preponderance of the evidence." (quoting 18 U.S.C. § 3664(e))).

"To meet its burden, the government must establish that the defendant's conduct has *directly and proximately caused* the losses for which the government seeks restitution." *Anthony II*, 22 F.4th at 950 (quoting *Anthony I*, 942 F.3d at 966) (emphasis added and cleaned up) ("To prove direct causation, it must show that, but for the

11

defendant's conduct, the victim would not have suffered those losses."). In setting a restitution amount, "the court need not calculate the harms with exact precision." *Anthony II*, 22 F.4th at 950 (cleaned up) (quoting *Anthony I*, 942 F.3d at 970).

### B.    But-For Cause

Coulter argues the district court erred in its restitution judgment because the amount requires Coulter to compensate the victims for harms that were not but-for caused by his actions. Specifically, he argues Dr. Missar knew, but failed to account for, the effects of the victims' previous sources of trauma which predate Coulter's actions.

We clarified in *Anthony I* and *Anthony II* that as part of its request for restitution, the government has the burden to disaggregate and differentiate the harms caused by a defendant from the harms not caused by the defendant. *Anthony I*, 942 F.3d at 967; *Anthony II*, 22 F.4th at 951. Such an inquiry was prudent in *Anthony I* and *Anthony II* because multiple individuals, including the defendant, had sexually trafficked a 14-year-old victim during the span of six months. And yet, the expert recommended restitution against the defendant based on a *combined* loss of *all* the victim's sexual trafficking incidents, without "differentiat[ing] between the losses [the victim] suffered at the hands of other abusers and the losses caused by [the defendant's] offenses." *Anthony II*, 22 F.4th at 953; *see also id.* at 951 (expert's opinion that victim "will require specific therapy to address the trauma that she suffered during the abuse she endured from her [seven victimizers]" failed to satisfy the but-for causation test as to the one, specific defendant in the case).

Like the district court in *Anthony I* and *Anthony II*, Coulter claims the district court failed to differentiate the psychological consequences of Doe 1 and Doe 2's trauma from Coulter's sexual trafficking with those from other traumatic experiences. For example, Coulter points to trauma Doe 1 likely experienced when her two friends committed suicide, or when a family member molested her when she was seven years old; he also highlights trauma Doe 2 likely experienced because of "the death of her mother, an unstable home situation, betrayal by a family member, and contact with the sex trafficking world outside of the acts at issue in this litigation." Aplt. Br. 6, 10.

We agree the government has met its burden of demonstrating Doe 1 and Doe 2's injuries, for purposes of restitution, are only for losses resulting from the sex trafficking in this case. To begin, the facts in *Anthony I* and *Anthony II* are unlike those in this case. Again, the victim in *Anthony* was found to have experienced trauma from sexual trafficking, but it was unclear how much the defendant had contributed to the trauma given multiple individuals trafficked the victim around the same time. Accordingly, it was not established how much of the victim's treatment costs should be allocated to the defendant because the government did not demonstrate that the attributed losses were but-for caused by him. *See Anthony I*, 942 F.3d at 969 ("We recognize the difficulty in setting a restitution amount in cases like this one, where the victim's asserted losses *overlap* with *similar* harms that occurred before the events at issue." (emphases added)). Here, there is no confusion as to *who* were the but-for causes of Doe 1 and Doe 2's sexual-trafficking related traumas because such harms could have only been caused by Coulter and his co-conspirator, Andrade, as established at trial.

13

To the extent Coulter argues the treatment costs for Doe 1 and Doe 2's trauma are not derived from sexual trafficking and instead to other traumas in their past, we find the argument unpersuasive. Unlike in *Anthony I* and *Anthony II*, the victims' losses predating Coulter's offense actions are not of the same nature as (*i.e.*, *similar* to) Coulter's offense conduct—neither were sexually trafficked nor similarly traumatized around the same time period. More importantly, Dr. Missar testified on cross-examination about his "degree of certainty" that Doe 1 and Doe 2's recommended therapy are "exclusively the product of being sex[ually] trafficked." App. Vol. III, 116 ("The estimates that I've given there, and the diagnoses and the treatments for them, in my opinion, are linked specifically to the sex trafficking."). Further, Dr. Missar opined Doe 1's PTSD symptoms (*i.e.*, flashbacks when passing by hotels, fear for personal safety and encountering Coulter, etc.), as well as depression and dysthymia symptoms are "directly connected to the sex trafficking crimes for *this case*" and "specific experiences she had in being trafficked." *Id.* at 118–20 (emphasis added).

As to Doe 2, Dr. Missar opined that Doe 2's PTSD and dysthymic disorder and related symptoms (*i.e.*, depressive conditions, nightmares, flashbacks, periodic suicidal ideation, etc.) are "directly tied" and "related" to the sex trafficking that occurred. He testified that Doe 2's preexisting ADHD and reading disorder symptoms worsened due to the sex trafficking, evidenced by her lack of ability to focus or maintain concentration "because of the presence of traumatic experiences [and] flashbacks . . . that were directly related to the sexual trafficking experiences." *Id.* at 57–59. In short, Dr. Missar opined that knowledge of the victims' prior traumatic events did not change his analysis because

14

there is a "nexus" between the victims' experiences of being trafficked and their symptoms that require treatment. *See, e.g.*, *id.* at 27–28; *id.* at 50 ("[T]he nexus that Doe 1 drew, both in her victim impact statement as well as . . . in that subsequent interview [regarding her symptoms], she linked specifically and repeatedly to the experience with Mr. Coulter and Ms. Andrade, not to any prior traumatic experience."); *id.* at 61 ("[W]ith Doe 2, the nexus that she drew between the experiences she had of being trafficked and [her] internal conflict [*see* App. Vol. III, 52–53] really . . . came to light as she was being trafficked, in my opinion, led me to the conclusion that these things were a result of . . . the [sex trafficking] experiences she described.").[8]

Still, Coulter argues Dr. Missar concedes he did not analyze "to what degree the prior abuse had contributed to the victims' current medical status." Aplt. Reply Br. 2. But that inquiry is irrelevant to what the government must prove for restitution purposes. Instead, the government is required to demonstrate the defendant's conduct was the but-for and proximate cause of the victims' losses for which restitution is sought. *See Anthony II*, 22 F.4th at 950 ("'[A] defendant cannot avoid liability just by citing some other factor that contributed to' the harm." (quoting *Bostock v. Clayton Cty.*, 590 U.S. 644, 645 (2020))).

---

[8] Coulter argues Dr. Missar merely pointed to the victims' "fears" relating to Coulter to support but-for causation without explaining the effect of past traumas. Aplt. Br. 9. But such fears can be considered "symptoms of psychological trauma" caused by Coulter's actions which require psychological or psychiatric treatment. *See Anthony I*, 942 F.3d at 960. And Coulter's concerns that Doe 1 or Doe 2's "fears" may be irrational or overstated are resolved by the preponderance of the evidence standard the district court must consider in ordering restitution.

We, therefore, find the district court did not abuse its discretion in finding Coulter was the but-for cause of the victims' injuries for purposes of restitution.

### C.    Restitution Amount

Coulter argues that even if but-for causation is proven, the district court erred in awarding ten years of restitution for ongoing individual therapy, psychiatric treatment, and medication. He contends there is insufficient evidence to support the restitution award amount, especially because Dr. Missar only recommended a lifetime of treatment for those categories.

Under the TVPRA, a defendant is responsible for the "full amount of [a] victim's losses . . . includ[ing] any costs incurred, or that are *reasonably projected* to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim." *Anthony II*, 22 F.4th at 946 (emphasis added) (quoting 18 U.S.C. § 2259(c)(2)). The district court "need not calculate the harms with exact precision, but it must set a restitution amount that is 'rooted in a calculation of actual loss.'" *Anthony I*, 942 F.3d at 970 (citations and internal quotations omitted). "A district court abuses its discretion if it orders a restitution amount based on . . . a clearly erroneous assessment of the evidence." *Anthony I*, 942 F.3d at 964 (quoting *United States v. Howard*, 784 F.3d 745, 750 (10th Cir. 2015)).

Here, we find no abuse of discretion in the district court's decision to limit the three categories of restitution—ongoing individual therapy, psychiatric treatment, and medication—to ten years as opposed to Doe 1 and Doe 2's lifetime. Certainly, Coulter's conduct was heinous; but the government failed to satisfy the court that it merited a

16

lifetime of compensation for related therapy and medication. *See Anthony II*, 22 F.4th at 951. ("[The defendant's] conduct toward [the victim] was reprehensible, but the government still must prove how that conduct warrants compensation for a lifetime of psychological treatment [and medication]." (cleaned up and citation removed)). For both Doe 1 and Doe 2, Dr. Missar noted that "due to the destabilizing issues inherent in the trauma itself, it may take a patient many years to fully entrust oneself to the therapeutic process" and that "struggles in trusting the therapist can take years to resolve themselves." App. Vol. II, 78, 92. But "many years" does not necessarily equate to requiring treatment for Doe 1 or Doe 2's lifetime. And while we do not disagree with Dr. Missar that a sexually trafficked victim "will be touched by [the inflicted trauma] in some way" for the rest of her life, App. Vol. III, 103–04 ("Trauma survivors deal with short and long-term effects of the trauma throughout their lives."), finding that restitution is warranted for Doe 1 and Doe 2's lifetime inevitably requires speculation that victims will not recover at all, even after years of therapy sessions or related treatment.

That is not to say, however, restitution over a lesser number of years would not be warranted. In fact, Dr. Missar opined in his expert report that "participating in group therapy with other PTSD sufferers for a period of not less than ten years will be critical" for both Doe 1 and Doe 2. App. Vol. II, 79, 93. Here, we find it reasonable that the district court would cap restitution for all therapy and treatments at ten years—the same duration recommended for group therapy—while keeping the two years of intensive individual therapy and psychiatric treatment as recommended by Dr. Missar.

17

In arguing that Dr. Missar never opined about a ten-year timeframe for Doe 1 and Doe 2's ongoing individual therapy, psychiatric treatment, and medication, Coulter seemingly argues that a district court must only affirm or reject an expert's recommended restitution award. But an expert's report or testimony are only portions of the record that district court should consider. And in considering them with the rest of the record—which may include victim impact statements and trial evidence and testimony—a district court is directed to use *its discretion* in reasonably projecting a restitution award applicable to a victim's loss caused by the defendant's actions. It would be an unrealistic and unsupportable rule to require district courts to either accept all or none of an expert's recommendation. That Dr. Missar did not opine on the exact timeframe of the restitution categories determined by the district court does not make us doubt the roadmap it used to reach its conclusions. Indeed, the district court carefully calculated sums that were less than twenty percent of the government's restitution request, a finding that greatly benefited Coulter.

We recognize that further explanation of the district court's rationale may have been helpful to understand the exact reasons behind the district court's decision in determining the restitution amount. At the same time, our inquiry and standard of review is to determine whether there was an *abuse* of discretion—we find there has not been such an abuse here. We therefore affirm the district court's determination of the restitution amount.

### III.    Conclusion

For the foregoing reasons, we affirm the district court's restitution award for Doe 1 and Doe 2 against Coulter.